CYBER PROMOTIONS, INC.

v.

AMERICAN ONLINE, INC.

AMERICAN ONLINE, INC.

v.

CYBER PROMOTIONS, INC.

Civ. A. Nos. 96–2486, 96–5213.

United States District Court,
E.D. Pennsylvania.

Nov. 4, 1996.

Opinion Denying Reconsideration
Dec. 20, 1996.

Ralph A. Jacobs, Richard M. Bernstein, Hoyle, Morris & Kerr, Philadelphia, PA, Glenn S. Gitomer, Janeen Olsen Dougherty, McCausland, Keen & Buckman, Radnor, PA, Jonathan A. David, Lerner, David, Littenberg, Krumholz and Mentlik, Westfield, NJ, for Cyber Promotions, Inc. in Civ. A. No. 96–CV–2486.

Ronald P. Schiller, David L. Weinreb, Piper and Marbury, Philadelphia, PA, for America Online Incorporated in Civ. A. No. 96–CV–2486.

Michael A. Grow, Vorys, Sater, Seymour and Pease, Washington, DC, Ronald P. Schiller, Piper and Marbury, Philadelphia, PA, for America Online, Inc. in Civ. A. No. 96–CV–5213.

Richard M. Bernstein, Hoyle, Morris & Kerr, Philadelphia, PA, Glenn S. Gitomer, McCausland, Keen & Buckman, Radnor, PA, Paul H. Kochanski, Lerner, David, Littenberg, Krumholz and Mentlik, Westfield, NJ, for Cyber Promotions, Inc. in Civ. A. No. 96–CV–5213.

### MEMORANDUM OPINION AND ORDER

WEINER, District Judge.

These cases present the novel issue of whether, under the First Amendment to the United States Constitution, one private company has the unfettered right to send unsolicited e-mail advertisements to subscribers of another private online company over the Internet and whether the private online company has the right to block the e-mail advertisements from reaching its members. The question is important because while the Internet provides the opportunity to disseminate vast amounts of information, the Internet does not, at least at the present time, have any means to police the dissemination of that information. We therefore find that, in the absence of State action, the private online service has the right to prevent unsolicited e-mail solicitations from reaching its subscribers over the Internet.

The cases have their genesis in a letter dated January 26, 1996, in which American Online, Inc. ("AOL") advised Cyber Promotions, Inc. ("Cyber") that AOL was upset with Cyber's dissemination of unsolicited e-mail to AOL members over the Internet. AOL subsequently sent a number of "e-mail bombs"[1] to Cyber's Internet service providers ("ISP").

On March 26, 1996, Cyber filed Civil Action No. 96–2486 in this Court against AOL in response to AOL's "e-mail bombing" of Cyber's ISPs. The Complaint alleges that as a result of AOL's "e-mail bombing", two of Cyber's ISPs terminated their relationship with Cyber and a third ISP refused to enter into a contract with Cyber. The Complaint asserts a claim for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, as well as state law claims for intentional interference with contractual relations, tortious interference with prospective contractual relations and unfair competition. The Complaint seeks certain injunctive relief and damages.

On April 8, 1996, AOL filed a ten-count Complaint against Cyber in the United States District Court for the Eastern District of Virginia, alleging service and trade name infringement, service mark and trade name dilution, false designation of origin, false advertising, unfair competition, violations of the Virginia Consumer Protection Act, the Electronic Communications Privacy Act, the Computer Fraud and Abuse Act and the Virginia Computer Crimes Act. AOL seeks various injunctive relief and damages.

---

1. In past submissions, Cyber has stated that AOL's "e-mail bombs" occurred when AOL gathered all unsolicited e-mail sent by Cyber to undeliverable AOL addresses, altered the return path of such e-mail, and then sent the altered e-mail in a bulk transmission to Cyber's ISPs in order to disable the ISPs.

On May 8, 1996, Cyber filed a First Amended Complaint in Civil Action No. 96–2486 in which it asserted the same four claims it asserted in its original Complaint and added a declaratory judgment claim (Count V). Cyber seeks, *inter alia*, a "declaration that [it] has the right to send to AOL members via the Internet unsolicited e-mail advertisements." Amended Complaint at p. 21. Cyber also asks the Court to "permanently enjoin[ ] AOL … from … directly or indirectly preventing AOL members from receiving [Cyber's] e-mail messages." *Id.*

On June 17, 1996, AOL filed a First Amended Complaint in the Virginia action in which it added claims for misappropriation, conversion, and unjust enrichment.

By Order dated July 24, 1996, the judge in the Eastern District of Virginia to whom AOL's action was assigned, transferred that action to this Court, finding that it arises from "the same nucleus of operative facts" as Cyber's action and that therefore "the two cases should be consolidated for trial." Upon transfer to this Court, AOL's action was assigned Civil Action No. 96–5213. The parties have agreed that the First Amended Complaint in that action will be treated as setting forth AOL's counterclaims in Civil Action No. 96–2486.

AOL has vehemently argued throughout the brief history of these suits that Cyber has no right to send literally millions of e-mail messages each day to AOL's Internet servers free of charge and resulting in the overload of the e-mail servers. Indeed, the court has received a plethora of letters from disgruntled AOL members who object to having to receive Cyber's unsolicited e-mail whenever they sign on to AOL despite repeated attempts to be removed from Cyber's lists. Cyber, on the other hand, has contended that without the right to send unsolicited e-mail to AOL members, it will go out of business.

Recognizing that Cyber's contention that it has the right to send unsolicited e-mail to AOL members over the Internet implicates the First Amendment and therefore is a threshold issue, the Court directed the parties to brief the following issue: Whether Cyber has a right under the First Amendment of the United States Constitution to send unsolicited e-mail to AOL members via the Internet and concomitantly whether AOL has the right under the First Amendment to block the e-mail sent by Cyber from reaching AOL members over the Internet. In response, AOL has filed a document entitled "Motion for Partial Summary Judgment of America Online, Inc. on First Amendment issues." Specifically, AOL seeks summary judgment on Cyber's declaratory judgment claim asserted in Count V of Cyber's First Amended Complaint. Cyber has filed a document entitled "Plaintiff's Memorandum in Support of its First Amendment Right to Send Internet E–Mail to Defendant's Members."

The Court also directed the parties to enter into a Stipulation of Facts solely for the purpose of resolving the First Amendment issue. Pursuant to the Court's directive, the parties have stipulated to the following facts:

1. Cyber is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, having a place of business at 1255 Passmore Street, 1st Floor, Philadelphia, Pennsylvania 19111.

2. AOL is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 22000 AOL Way, Dulles, Virginia 20166.

3. AOL was and is a private online company that has invested substantial sums of its own money in equipment, name, software and reputation. AOL is not owned in whole or in part by the government.

4. AOL is owned by shareholders, and its stock trades on the New York Stock Exchange.

5. AOL is not a government entity or political subdivision.

6. AOL's members or subscribers pay prescribed fees for use of AOL resources, access to AOL and access and use of AOL's e-mail system and its connection to the Internet.

7. AOL's e-mail system operates through dedicated computers known as servers, which consist of computer hardware and software purchased, maintained and owned by AOL.

AOL's computer servers have a finite, though expandable, capacity to handle e-mail. All Internet e-mail from non-AOL members to AOL customers or members and from AOL customers or members to non-AOL members requires the use of AOL's computer hardware and software in combination with the hardware and software of the Internet and the hardware and software of the non-AOL members.

8. Private companies compete with AOL in the online business.

9. There has been no government involvement in AOL's business decision to institute or reinstitute a block directed to Internet e-mail sent by Cyber to AOL members or subscribers.

10. Although the Internet is accessible to all persons with just a computer, a modem and a service provider, the constituent parts of the Internet (namely the computer hardware and software, servers, service providers and related items) are owned and managed by private entities and persons, corporations, educational institutions and government entities, who cooperate to allow their constituent parts to be interconnected by a vast network of phone lines.

11. In order for non-AOL members to send Internet e-mail to AOL members, non-AOL members must utilize a combination of their own hardware and software, the Internet and AOL's network.

12. To obtain its initial access to the Internet, AOL obtained an Internet address and domain name from IANA, a clearinghouse that routinely and ministerially assigns Internet addresses and domain names.

13. Cyber, an advertising agency incorporated in 1996, provides advertising services for companies and individuals wishing to advertise their products and services via e-mail.

14. Cyber sends its e-mail via the Internet to members of AOL, members of other commercial online services and other individuals with an Internet e-mail address.

15. AOL provides its subscribing members with one or more e-mail addresses so that members can exchange e-mail with one another and exchange e-mail (both sending and receiving) over the Internet with non-AOL members.

16. AOL has attached to its Memorandum of Law in Support of its Motion for Partial Summary Judgment on First Amendment Issues three sets of examples of e-mail messages sent by Cyber to AOL members. The first set (Tab 1) consists of a multi-page set of advertisements; the second set (Tab 2) consists of an exclusive or single-advertiser e-mail; and the third set (Tab 3) consists of a document called by Cyber an "e-mag." Under each tab are two examples, the first selected by AOL and the second selected by Cyber. The Court has reviewed all of the examples and notes that many of the ads include get-rich-quick ads, weight loss ads, health aid promises and even phone sex services.

17. To attract membership, AOL offers a variety of services, options, resources and support, including content-based services, access to stock quotes, children's entertainment, news, and the ability to send and receive Internet e-mail to and from non-AOL members.

In addition to the parties's Stipulation of Facts, it is necessary for resolution of the issue before us to relate some of the factual findings about the Internet itself made earlier this year by our court in *American Civil Liberties Union v. Reno*, 929 F.Supp. 824 (E.D.Pa.1996). They are as follows:

18. "The Internet is ... a unique and wholly new medium of worldwide human communication." *Id.* at 844.

19. The Internet is "a giant network which interconnects innumerable smaller groups of linked computer networks." *Id.* at 830. In short, it is "a global Web of linked networks and computers ..." *Id.* at 831.

20. "The Internet is an international system." *Id.* It is "a decentralized, global medium of communications—or 'cyberspace'— that links people, institutions, corporations, and governments around the world. This communications medium allows any of the literally tens of millions of people with access to the Internet to exchange information." *Id.*

21. "No single entity—academic, corporate, governmental, or non-profit—administers the Internet. It exists and functions as a result of the fact that hundreds of thousands of separate operators of computers and computer networks independently decided to use common data transfer protocol to exchange communications and information with other computers (which in turn exchange communications and information with still other computers)." *Id.* at 832.

22. Computer users have a wide variety of avenues by which to access the Internet. *Id.* One such avenue is "through one of the major national commercial 'online services' such as [AOL] ... *Id.* at 833. These online services offer nationwide computer networks (so that subscribers can dial-in to a local telephone number), and the services provide extensive and well organized content within their own proprietary computer networks. In addition to allowing access to the extensive content available *within* each online service, the services also allow subscribers to link to the much larger resources of the Internet." *Id.* (emphasis in original). "The major commercial online services have almost twelve million individual subscribers across the United States." *Id.* Approximately six million individuals are subscribers of AOL.

23. There are a number of different ways to communicate over the Internet. One such way "is via electronic mail, or 'e-mail', comparable in principle to sending a first class letter. One can address and transmit a message to one or more other people." *Id.* at 834.

24. "[T]he content on the Internet is as diverse as human thought." *Id.* at 842.

25. "Communications over the Internet do not 'invade' an individuals's home or appear on one's computer screen unbidden. Users seldom encounter content 'by accident.'" *Id.* at 844.

26. Unlike a radio or television, "the receipt of information on the Internet requires a series of affirmative steps more deliberate and directed than merely turning a dial." *Id.* at 845.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted when, "after considering the record evidence in the light most favorable to the non-moving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Turner v. Schering–Plough Corp.,* 901 F.2d 335, 340–41 (3d Cir. 1990). For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir.1989). To establish a genuine issue of material fact, the non-moving party must introduce evidence beyond the mere pleadings to create an issue of material fact on "an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The burden of demonstrating the absence of genuine issues of material fact is initially on the moving party regardless of which party would have the burden of persuasion at trial. *First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins.,* 824 F.2d 277, 280 (3d Cir. 1987). Following such a showing, the non-moving party must present evidence through affidavits or depositions and admissions on file which comprise of a showing sufficient to establish the existence of every element essential to that party's case. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. If that evidence is, however, "'merely colorable' or is 'not significantly probative,' summary judgment may be granted." *Equimark Commercial Finance Co. v. C.I.T. Financial Corp.* 812 F.2d 141, 144 (3d Cir.1987) (quoting, in part, *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11).

In view of the parties' Stipulation of Facts and the prior factual findings of this Court in *ACLU v. Reno, supra.,* the Court finds there are no genuine issues of material fact as to the First Amendment issue and that that issue is suitable for summary disposition.

In its Motion for Partial Summary Judgment, AOL contends that Cyber has no First

Amendment right to send unsolicited e-mail to AOL members over the Internet because AOL is not a state actor, AOL's e-mail servers are not public fora in which Cyber has a right to speak, Cyber's right to use AOL's, service free of charge, does not substantially outweigh AOL's right to speak or not to speak, and that AOL's restrictions on mass e-mail solicitations are tailored to serve a substantial interest. Motion for Partial Summary Judgment at 6. Because we find AOL is not a state actor and none of its activities constitute state action, we need not consider AOL's remaining First Amendment contentions.

The First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or, prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press." The United States Supreme Court has recognized that "the constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state." *Hudgens v. NLRB*, 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976). Only recently, the Supreme Court has stated that "the guarantees of free speech ... guard only against encroachment by the government and 'erec[t] no shield against merely private conduct.'" *Hurley v. Irish–American Gay Group of Boston,* —— U.S. ——, ——, 115 S.Ct. 2338, 2344, 132 L.Ed.2d 487 (1995) (citation omitted).

In the case *sub judice,* the parties have stipulated that AOL is a *private* online company that is not owned in whole or part by the government. Stipulation of Facts at ¶ 3. (emphasis added). The parties have further stipulated that "AOL is not a government entity or political subdivision." *Id.* at ¶ 5. They have also stipulated that there has been no government involvement in AOL's business decision to institute or reinstitute a block directed to Internet e-mail sent by Cyber to AOL members or subscribers. *Id.* at ¶ 9.

■ Despite these stipulations, Cyber argues that AOL's conduct has the character of state action. As a general matter, private action can only be considered state action when "there is a sufficiently close nexus between the State and the challenged action of [the private entity] so that the action of the latter may be fairly treated as that of the State itself." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982). Recently, our Court of Appeals observed that the Supreme Court appears to utilize three distinct tests in determining whether there has been state action. *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1142 (3d Cir.1995). First, we must consider whether "'the private entity has exercised powers that are traditionally the *exclusive* prerogative of the state.'" *Id.* (quoting *Blum v. Yaretsky,* 457 U.S. at 1004–05, 102 S.Ct. at 2785–86. (emphasis in *Mark* )). This test is known as the exclusive public function test. If the private entity does not exercise such powers, we must consider whether "'the private entity has acted with the help of or in concert with state officials.'" *Mark,* 51 F.3d at 1142 (quoting *McKeesport Hospital v. Accreditation Council for Graduate Medical Ed.,* 24 F.3d 519, 524 (3d Cir. 1994)). The final test is whether "'[t]he State has so far insinuated itself into a position of interdependence with ... [the acting party] that it must be recognized as a joint participant in the challenged activity.'" *Mark,* 51 F.3d at 1142 (quoting *Krynicky v. University of Pittsburgh,* 742 F.2d 94, 98 (3d Cir.1984)).

■ With regard to the first test, AOL exercises absolutely no powers which are in any way the prerogative, let alone the *exclusive* prerogative, of the State. In *ACLU, supra,* this Court previously found that no single entity, including the State, administers the Internet. *ACLU,* 929 F.Supp. at 832. Rather, the Court found that the Internet is a "global Web of linked networks and computers" which exists and functions as the result of the desire of hundreds of thousands of computer operators and networks to use common data transfer data protocol to exchange communications and information. *Id.* In addition, "the constituent parts of the Internet ... are owned and managed by private entities and persons, corporations, educational institutions and government entities, who cooperate to allow their constituent

parts to be interconnected by a vast network of phone lines." Stipulation of Facts at ¶ 10. As a result, tens of millions of people with access to the Internet can exchange information. AOL is merely one of many private online companies which allow its members access to the Internet through its e-mail system where they can exchange information with the general public. The State has absolutely no interest in, and does not regulate, this exchange of information between people, institutions, corporations and governments around the world.

Cyber argues, however, that "by providing Internet e-mail and·acting as the sole conduit to its members' Internet e-mail boxes, AOL has opened up that part of its network and as such, has sufficiently devoted this domain for public use. This dedication of AOL's Internet e-mail accessway performs a public function in that it is open to the public, free of charge to any user, where public discourse, conversations· and commercial transactions can and do take place." Cyber's Memorandum in Support of its First Amendment Right to Send Internet E–Mail to Defendant's Members at 13. Cyber therefore contends that AOL's Internet e-mail accessway is similar to the company town in *Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), which the Supreme Court found performed a public function and therefore was a state actor.

In *Marsh*, a Jehovah's Witness was convicted of criminal trespass for distributing literature without a license on a sidewalk in a town owned by a private company. The Supreme Court found that since the private company owned the streets, sidewalks, and business block, paid the sheriff, privately owned and managed the sewage system, and owned the building where the United States post office was located, the company, in effect, operated as the municipal government of the town. *Marsh*, 326 U.S. at 502–03, 66 S.Ct. at 276–77. "[T]he owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State." *Lloyd Corp. v. Tanner*, 407 U.S. 551, 569, 92 S.Ct. 2219, 2229, 33 L.Ed.2d 131 (1972). The Court observed that "[t]he more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Marsh*, 326 U.S. at 506, 66 S.Ct. at 278. As a result, the Court found state action in "the State['s] ... attempt[ ] to impose criminal punishment on appellant for undertaking to distribute religious literature in a company town ..." *Marsh*, 326 U.S. at 509, 66 S.Ct. at 280. Our Court of Appeals has noted that "*Marsh* has been construed narrowly." *Cable Investments, Inc. v. Woolley*, 867 F.2d 151, 162 (3d Cir.1989).[2]

By providing its members with access to the Internet through its e-mail system so that its members can exchange information with those members of the public who are also connected to the Internet, AOL is not exercising *any* of the municipal powers or public services traditionally exercised by the State as did the private company in *Marsh*. Although AOL has technically opened its e-mail system to the public by connecting with· the Internet, AOL has not opened its property to the public by performing any municipal power or essential public service and, therefore, does not stand in the shoes of the State. *Marsh* is simply inapposite to the facts of the case *sub judice*.

Cyber also argues that AOL's Internet e-mail connection constitutes an exclusive pub-

---

**2.** Indeed, our Court of Appeals has observed that the exclusive public function test itself "rarely could be satisfied." *Mark*, 51 F.3d at ·1142. "Thus, in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), the Court held that a private utility company, extensively regulated by the state, and apparently holding at least a partial monopoly in its territory, did not act under color of state law, in part because the state where the utility was engaged in business had 'rejected the contention that the furnishing of utility services is either a state function or a municipal duty.' (citation omitted).

Similarly, in *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Court held that a private entity engaged in the education of maladjusted high school students did not perform an exclusively public function because '[the state's] legislative policy choice [to fund the public school] in no way makes these services the exclusive province of the State.' (citation omitted); *see also Black v. Indiana Area Sch. Dist.*, 985 F.2d 707, 710–11 (3d Cir.1993) (private contractor providing state school bus program at state expense not performing exclusive state function)." *Mark, id.*

lic function because there are no alternative avenues of communication for Cyber to send its e-mail to AOL members. As support for this proposition, Cyber directs our attention to the decisions of the Supreme Court in *United States Postal Service v. Greenburgh Civic Assn's*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981); *Lloyd Corp v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972) and *Amalgamated Food Employees Union v. Logan Valley Plaza*, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968). Of these decisions, only the *Lloyd* decision is helpful to Cyber.

In *Greenburgh*, a civic association challenged a federal statute which prohibited the deposit of unstamped "mailable matter" in a letterbox approved by the United States Postal Service. The civic association contended that the First Amendment guaranteed them the right to deposit, without postage, their notices, circulars, flyers in such letterboxes. The Supreme Court upheld the constitutionality of the statute, finding that neither the enactment nor the enforcement of the statute was geared in any way to the content of the message sought to be placed in the letterbox. The Court also noted that the statute did not prevent individuals from going door-to-door to distribute their message or restrict the civic organization's right to use the mails. *Greenburgh*, however, did not involve the issue of whether there was state action. It therefore is inapplicable to the issue of whether AOL's conduct constitutes state action.

In *Logan Valley*, a case involving peaceful picketing directed solely at one establishment within a shopping center, the Court reviewed the *Marsh* decision in detail, emphasized the similarities between a shopping center and a company town and concluded that a shopping center is the "functional equivalent" of the business district in *Marsh*. As a result, the Court held that the picketers had a First Amendment right to picket within a shopping center. *Logan Valley*, however, was subsequently overruled by *Lloyd*, *supra*. *Hudgens v. National Labor Relations Board*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976). ("[W]e make clear now, if it was not clear before, that the rationale of *Logan Valley* did not survive the Court's decision in the *Lloyd* case.")

In *Lloyd*, a group of individuals sought to distribute handbills in the interior of a privately owned shopping center. The content of the handbills was not directed at any one establishment in the shopping center but instead was directed at the Vietnam War. The Court noted that, unlike the situation in *Logan Valley* where the protestors had no other alternative to convey their message at the single establishment in the shopping center, the protesters in *Lloyd* could distribute their message about the Vietnam war on any public street, sidewalk or park outside the mall. The Court therefore found that "[i]t would be an unwarranted infringement of property rights to require [the protesters] to yield to the exercise of First Amendment under circumstances where adequate alternative avenues of communication exist." *Lloyd*, 407 U.S. at 567, 92 S.Ct. at 2228. The *Lloyd* Court went on to reject the individuals' functional equivalency argument, finding that the private shopping center neither assumed the full spectrum of municipal powers nor stood in the shoes of the state, as did the private company in *Marsh*. The Court held that, "[t]he First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on *state* action, not on action by the owner of private property used nondiscriminatorily for private purposes only." *Lloyd*, 407 U.S. at 567, 92 S.Ct. at 2228 (emphasis in original).

Cyber has numerous alternative avenues of sending its advertising to AOL members. An example of another avenue Cyber has of sending its advertising to AOL members over the Internet is the World Wide Web which would allow access by Internet users, including AOL customers, who *want* to receive Cyber's e-mail. Examples of non-Internet avenues include the United States mail, telemarketing, television, cable, newspapers, magazines and even passing out leaflets. Of course, AOL's decision to block Cyber's e-mail from reaching AOL's members does not prevent Cyber from sending its e-mail advertisements to the members of competing commercial online services, includ-

ing CompuServe, the Microsoft Network and Prodigy.

■ Having found that AOL is not a state actor under the exclusive public function test, we evaluate whether AOL is a state actor under the remaining two tests, i.e. whether AOL is acting with the help of or in concert with state officials and whether the State has put itself in a position of interdependence with AOL such that it must be considered a participant in AOL's conduct. These tests actually overlap one another.

In its Memorandum, Cyber does not specifically argue that AOL is acting in concert with state officials. Indeed, the two major cases from the Supreme Court which have found state action under this test are clearly distinguishable from the case *sub judice.* See, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (finding a conspiracy between a private actor and a state official to engage in unlawful discrimination constituted action under color of law for purposes of 42 U.S.C. § 1983); *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (finding private creditor's pre-judgment attachment petition upon which clerk of state court issued a writ of attachment and sheriff executed the writ on property of private debtor was state action under § 1983).

Rather, Cyber relies on the "joint participation" doctrine and contends that "AOL's use of the Court to obtain injunctive relief and/or damages [which it seeks in its prayer for relief in its counterclaim] and its assertions of federal and state statutory law, which if applicable to Cyber's activities, would violate Cyber's First Amendment rights." Cyber's Memorandum at 15.

In *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) the Supreme Court refined the joint participation test by announcing that courts must ask "first whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority; and second, whether the private party charged with the deprivation could be described in all fairness as a state actor." *Edmonson,* 500 U.S. at 620, 111 S.Ct. at 2082–83. Under the first prong, the inquiry

is "under what authority did the private person engage in the allegedly unlawful acts." *Mark,* 51 F.3d at 1144.

In the case *sub judice,* the parties have stipulated that "[t]here has been no government involvement in AOL's business decisions with respect to e-mail sent by Cyber nor in any AOL decision to institute or reinstitute a block directed to Internet e-mail sent by Cyber to AOL members or subscribers." Stipulation of Facts at ¶ 9. As a result, Cyber is unable to satisfy even the first prong of the joint participation test.

In addition, our Court of Appeals has stated that "[m]erely instituting a routine civil suit does not transform a litigant's actions into those taken under color of state law." *Tunstall v. Office of Judicial Support,* 820 F.2d 631, 634 (3d Cir.1987). The *Tunstall* Court concluded that the filing of a quiet title action in state court by a purchaser of land to complete the seizure of plaintiff's property did not involve state action since the suit "did not attempt any seizure of property with the cooperation of state officials as in the *Lugar* line of cases." *Id.* In addition, the United States Court of Appeals for the Eleventh Circuit has found that a regulated utility did not act under color of state law when it obtained a temporary restraining order from a state court. *Cobb v. Georgia Power Co.,* 757 F.2d 1248 (11th Cir.1985). The United States Court of Appeals for the Second Circuit has held that the mere filing of a state law contempt proceeding does not constitute joint participation so as to satisfy the color of state law requirement under 42 U.S.C. § 1983. *Dahlberg v. Becker,* 748 F.2d 85 (2d Cir.1984).

Perhaps recognizing the futility of its argument, Cyber contends in its Reply Memorandum that "[i]t is not Cyber's position that the mere filing of an action provides a party with the requisite state action to assert a First Amendment violation. Rather it is the Court's participation with the litigant in issuing or enforcing an order which impinges on another's First Amendment rights. *Grandbouche v. Clancy,* 825 F.2d 1463, 1466 (10th Cir.1987)." Reply Memorandum at 7. In *Grandbouche,* the United States Court of

Appeals for the Tenth Circuit stated that the first Amendment "may be applicable in the context of discovery orders, even if all of the litigants are private entities." The Court found government action present as a result of a magistrate's order compelling discovery and the trial court's enforcement of that order.

We are troubled by the *Grandbouche* decision because it has the effect of creating government action every time a magistrate simply signs, and a trial judge enforces, a discovery order. Therefore, even if this Court had enforced a discovery order (which we have not), we would not follow the *Grandbouche* decision.

In sum, we find that since AOL is not a state actor and there has been no state action by AOL's activities under any of the three tests for state action enunciated by our Court of Appeals in *Mark*, Cyber has no right under the First Amendment to the United States Constitution to send unsolicited e-mail to AOL's members. It follows that AOL, as a private company, may block any attempts by Cyber to do so.

Cyber also contends that its practice of sending e-mail advertisements to AOL's servers is also protected "under state constitutional law, which in many instances, affords even broader protection than federal First Amendment guarantees which this Court can enforce." Cyber's Memorandum at 17. Specifically, Cyber refers to the state constitutions of Pennsylvania and Virginia.[3] Although this argument is beyond the scope of the issue the Court directed the parties to brief, we will nevertheless consider it at this time.

The theory that a state constitution's free speech provisions may afford broader rights than similar provisions of the United States Constitution was first recognized by the Supreme Court in *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). The *PruneYard* Court held that, while the First Amendment did not grant the defendants the right to solicit in a privately owned shopping center, state (California) law might grant that right. The Supreme Court of Pennsylvania has itself recognized that "Pennsylvania may afford greater protection to individual rights under its Constitution" than the Constitution of the United States. *Western Pennsylvania Socialist Workers 1982 Campaign v. Conn. Gen. Life Ins. Co.*, 512 Pa. 23, 515 A.2d 1331, 1333–34 (1986) (plurality opinion); *Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382 (1981).

Article 1, Section 7 of the Pennsylvania Constitution provides:

> The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject ...

In *Tate*, the only case on which Cyber relies, the Supreme Court of Pennsylvania overturned convictions for defiant trespass stemming from a group of protester's refusal to desist from distributing politically oriented materials in a peaceful manner on the campus of a privately owned college. The court found that the college had created a public forum by opening the campus to the public to hear the director of the FBI to speak in a campus building. Because the college had become a public forum and because the defiant trespass statute had provided a defense to a charge of defiant trespass in those circumstances[4], the *Tate* Court held that the protesters had a right to speak freely without fear of criminal conviction under Article I, Section 7 of the Pennsylvania Constitution.

*Tate* was subsequently clarified by the Supreme Court of Pennsylvania in *Western Pennsylvania Socialist Workers, supra.* In that case, a political committee, its chairman, a gubernatorial candidate and a campaign worker claimed they had the right under, *inter alia*, Article 1, Section 7 of the Pennsyl-

---

3. Cyber contends it is entitled to the protection of the Pennsylvania Constitution because Cyber's e-mail originates from Pennsylvania and that it is entitled to the protection of the Virginia Constitution because AOL's blocking actions occur in Virginia.

4. Pa.Cons.Stat.Ann. tit. 18 § 3503(c)(2) provides: It is a defense to prosecution under this section that: the premises were at the time open to members of the public and the actor complied with all lawful conditions imposed on access to or remaining on the premises.

vania Constitution to collect signatures for the gubernatorial candidate's campaign at privately owned shopping malls, including one owned by Connecticut General Life Insurance Co. Connecticut General had a policy which uniformly prohibited all political activities including solicitation at its mall. The Court distinguished *Tate*, by observing that "[b]y adhering to a strict no political solicitation policy, [Connecticut General] has uniformly and generally prevented the mall from becoming a public forum." *Western Pennsylvania*, 515 A.2d at 1337. Rather, the Court noted that Connecticut General had only invited the public into the mall for commercial purposes. Since Connecticut General had not invited the public into the mall for political purposes, the Court held that Article 1, Section 7, was inapplicable.

The *Western Pennsylvania* Court also rejected attempts to analogize the mall to the company town in *Marsh v. Alabama, supra* by stating:

A shopping mall is not equivalent to a town. Though it duplicates the commercial function traditionally associated with a town's business district or marketplace, the similarity ends there. People do not live in shopping malls. Malls do not provide essential public services such as water, sewers roads, sanitation or vital records, nor are they responsible for education, recreation or transportation. Thus, the *Marsh* analysis is not applicable to the instant case.

*Western Pennsylvania*, 515 A.2d at 1338.

The case *sub judice* is more similar to *Western Pennsylvania* than it is to *Tate*. AOL's e-mail servers are certainly not a traditional public forum such as a street, park or even the college in *Tate*. Instead, AOL's e-mail servers are privately owned and are only available to the subscribers of AOL who pay a fee for their usage. Moreover, unlike *Tate*, AOL has not presented its e-mail servers to the public at large for disseminating political messages at a certain event. Indeed, AOL has never presented its e-mail servers to the public at large for dissemination of messages in general as AOL's servers have a finite capacity. Stipulation of Facts at ¶ 7. As noted above, AOL's e-mail

system simply provides a means for its members to communicate with those members of the public who are connected with the Internet.

Cyber also does not have the right under the Constitution of Virginia to send unsolicited e-mail over the Internet to AOL members. Article I, Section 12 of the Virginia Constitution provides:

That the freedoms of speech and of the press are among the great bulwarks of liberty, and can never be restrained except by despotic governments; that any citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; that the General Assembly shall not pass any law abridging the freedom of speech or of the press, nor the right of the people peaceably to assemble, and to petition the government for the redress of grievances.

There are no decisions which interpret this provision in a manner which would be helpful to Cyber. The decisions Cyber cites, *National Capital Naturists, Inc. v. Board of Supervisors*, 878 F.2d 128, 133 (4th Cir.1989); *Leachman v. Rector & Visitors of the Univ. of Virginia*, 691 F.Supp. 961, 964 n. 5 (W.D.Va.1988), *aff'd*, 915 F.2d 1564 (4th Cir. 1990); *Robert v. Norfolk*, 188 Va. 413, 49 S.E.2d 697, 700 (1948) all merely recognize the principle enunciated by the Supreme Court in *PruneYard* that states have the "sovereign right" to give their constitutions an expansive interpretation.

Although we have found that Cyber has no right under the First Amendment of the United States Constitution or under the Constitutions of Pennsylvania or Virginia to send unsolicited e-mail to members of AOL, we will not, at this time, enter judgment on Count V of Cyber's First Amended Complaint for declaratory relief. This is because Cyber contends in its Reply brief that "many more issues ... have to be addressed since there are numerous reasons beyond the First Amendment which will permit Cyber to send e-mail to AOL members." Cyber's Reply Memorandum at 1. Therefore, we will simply declare that Cyber has no right under the First Amendment to the United States Constitution or under the Constitutions of

Pennsylvania or Virginia to send unsolicited e-mail over the Internet to members of AOL. We will allow Cyber ten days from the date of this Memorandum Opinion and Order to submit a list of the theories other than the First Amendment it believes entitles it to send unsolicited e-mail to members of AOL.

An Order to that effect follows.

### ORDER

The motion of American Online, Inc. for partial summary judgment on First Amendment issues is GRANTED in part and DENIED in part.

The Court declares that Cyber Promotions, Inc. does not have a right under the First Amendment to the United States Constitution or under the Constitutions of Pennsylvania and Virginia to send unsolicited e-mail advertisements over the Internet to members of American Online, Inc. and, as a result, American Online, Inc. may block any attempts by Cyber Promotions, Inc. to do so.

Cyber Promotions, Inc. shall, within ten days of the date of this Order, submit to the Court a list of the theories other than the First Amendment which it believes entitles it to send unsolicited e-mail to members of American Online, Inc.

Either party may request that we issue an Order certifying our decision for an immediate interlocutory appeal to the United States Court of Appeals for the Third Circuit.

IT IS SO ORDERED.

### MEMORANDUM OPINION AND ORDER ON RECONSIDERATION

WEINER, District Judge.

Cyber Promotions, Inc. ("Cyber") has filed a motion for the Court to reconsider its

Memorandum Opinion and Order of November 4, 1996, in which we ruled that Cyber does not have a right under the First Amendment to the United States Constitution or under the Constitutions of Pennsylvania and Virginia to send unsolicited e-mail advertisements over the Internet to subscribers of American Online, Inc. ("AOL"). After careful reconsideration, we affirm our Memorandum Opinion and Order of November 4, 1996.

The parties specifically agreed to submit the First Amendment issue to the Court on a stipulated factual record. In addition to the stipulation of facts, Cyber also requested that the Court adopt several factual findings about the Internet that a three-judge panel had previously made in the case of *American Civil Liberties Union v. Reno,* 929 F.Supp. 824 (E.D.Pa.1996).[1] We not only adopted all of the findings from *Reno* that Cyber proposed but many other findings from *Reno* as well. Based on this record, we found that AOL was not a state actor and that there was no state action by AOL's activities under any of the three tests for state action enunciated by our Court of Appeals in *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1142 (3d Cir.1995).[2] Accordingly, we concluded that Cyber has no right under the First Amendment to the United States Constitution to send unsolicited e-mail to AOL's members and that AOL, as a private company, may block any attempts by Cyber to do so.

Cyber's motion for reconsideration is not based on any of the traditional criteria our Court of Appeals has enunciated for entertaining a motion for reconsideration such as an intervening change in the controlling law, discovery of new evidence, or to correct man-

---

1. In *Reno,* the three-judge panel granted a motion for a preliminary injunction filed by plaintiffs who claimed that two provisions of the Communications Decency Act of 1996 that are directed to communications over the Internet which might be deemed "indecent" of "patently offensive" for minors, defined as persons under the age of 18, violated their First Amendment free speech and Fifth Amendment due process rights.

2. The first test is known as the exclusive public function test. Under this test, the inquiry is

whether " 'the private entity has exercised powers that are traditionally the *exclusive* prerogative of the state.' " *Mark,* 51 F.3d at 1142 (citation omitted). Under the second test, the inquiry is whether " 'the private entity has acted with the help of or in concert with state officials.' " *Id.* (citation omitted). The final inquiry is whether " '[t]he State has so far insinuated itself into a position of interdependence with ... [the acting party] that it must be recognized as a joint participant in the challenged activity.' " *Id.* (citation omitted).

ifest errors of law or fact. *See, Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). Instead, the basis for this motion appears to be nothing more than the fact that Cyber has hired new counsel following our previous ruling against Cyber on the First Amendment issue and seeks to relitigate the First Amendment issue by submitting additional facts beyond the parties' stipulation. Plaintiff's new counsel also seeks to give his own interpretation to some of the cases Cyber cited in its original papers. Although such grounds are clearly not proper as part of a motion for reconsideration, we will nevertheless consider Cyber's arguments in support of its motion for reconsideration in order to have a complete record.

As noted above, the issue of whether Cyber had a First Amendment right to send its unsolicited e-mail advertisements to AOL was submitted to the Court on a Stipulation of Facts. In order to properly consider the arguments Cyber makes in its motion for reconsideration, it is useful to repeat those factual stipulations. They are as follows:

1. Cyber is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, having a place of business at 1255 Passmore Street, 1st Floor, Philadelphia, Pennsylvania 19111.

2. AOL is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 22000 AOL Way, Dulles, Virginia 20166.

3. AOL was and is a private online company that has invested substantial sums of its own money in equipment, name, software and reputation. AOL is not owned in whole or in part by the government.

4. AOL is owned by shareholders, and its stock trades on the New York Stock Exchange.

5. AOL is not a government entity or political subdivision.

6. AOL's members or subscribers pay prescribed fees for use of AOL resources, access to AOL and access and use of AOL's e-mail system and its connection to the Internet.

7. AOL's e-mail system operates through dedicated computers known as servers, which consist of computer hardware and software purchased, maintained and owned by AOL. AOL's computer servers have a finite, though expandable, capacity to handle e-mail. All Internet e-mail from non-AOL members to AOL customers or members and from AOL customers or members to non-AOL members requires the use of AOL's computer hardware and software in combination with the hardware and software of the Internet and the hardware and software of the non-AOL members.

8. Private companies compete with AOL in the online business.

9. There has been no government involvement in AOL's business decision to institute or reinstitute a block directed to Internet e-mail sent by Cyber to AOL members or subscribers.

10. Although the Internet is accessible to all persons with just a computer, a modem and a service provider, the constituent parts of the Internet (namely the computer hardware and software, servers, service providers and related items) are owned and managed by private entities and persons, corporations, educational institutions and government entities, who cooperate to allow their constituent parts to be interconnected by a vast network of phone lines.

11. In order for non-AOL members to send Internet e-mail to AOL members, non-AOL members must utilize a combination of their own hardware and software, the Internet and AOL's network.

12. To obtain its initial access to the Internet, AOL obtained an Internet address and domain name from IANA, a clearinghouse that routinely and ministerially assigns Internet addresses and domain names.

13. Cyber, an advertising agency incorporated in 1996, provides advertising services for companies and individuals wishing to advertise their products and services via e-mail.

14. Cyber sends its e-mail via the Internet to members of AOL, members of other commercial online services and other individuals with an Internet e-mail address.

15. AOL provides its subscribing members with one or more e-mail addresses so that members can exchange e-mail with one another and exchange e-mail (both sending and receiving) over the Internet with non-AOL members.

16. AOL has attached to its Memorandum of Law in Support of its Motion for Partial Summary Judgment on First Amendment Issues three sets of examples of e-mail messages sent by Cyber to AOL members. The first set (Tab 1) consists of a multi-page set of advertisements; the second set (Tab 2) consists of an exclusive or single-advertiser e-mail; and the third set (Tab 3) consists of a document called by Cyber an "e-mag." Under each tab are two examples, the first selected by AOL and the second selected by Cyber. The Court has reviewed all of the examples and notes that many of the ads include get-rich-quick ads, weight loss ads, health aid promises and even phone sex services.[3]

17. To attract membership, AOL offers a variety of services, options, resources and support, including content-based services, access to stock quotes, children's entertainment, news, and the ability to send and receive Internet e-mail to and from non-AOL members.

In addition to the parties's Stipulation of Facts, we found that it was necessary for resolution of the issue before us to adopt some of the factual findings about the Internet itself made earlier this year by the three-judge panel in *Reno*, 929 F.Supp. 824 (E.D.Pa.1996). They are as follows:

18. "The Internet is ... a unique and wholly new medium of worldwide human communication." *Id.* at 844.

19. The Internet is "a giant network which interconnects innumerable smaller groups of linked computer networks." *Id.* at 830. In short, it is "a global Web of linked networks and computers ..." *Id.* at 831.

20. "The Internet is an international system." *Id.* It is "a decentralized, global medium of communications—or 'cyberspace'—that links people, institutions, corporations, and governments around the world. This communications medium allows any of the literally tens of millions of people with access to the Internet to exchange information." *Id.*

21. "No single entity—academic, corporate, governmental, or non-profit—administers the Internet. It exists and functions as a result of the fact that hundreds of thousands of separate operators of computers and computer networks independently decided to use common data transfer protocol to exchange communications and information with other computers (which in turn exchange communications and information with still other computers)." *Id.* at 832.

22. Computer users have a wide variety of avenues by which to access the Internet. *Id.* One such avenue is "through one of the major national commercial 'online services'' such as [AOL] ... *Id.* at 833. These online services offer nationwide computer networks (so that subscribers can dial-in to a local telephone number), and the services provide extensive and well organized content within their own proprietary computer networks. In addition to allowing access to the extensive content available *within* each online service, the services also allow subscribers to link to the much larger resources of the Internet." *Id.* (emphasis in original). "The major commercial online services have almost twelve million individual subscribers across the United States." *Id.* Approximately seven million individuals are subscribers of AOL.[4]

23. There are a number of different ways to communicate over the Internet. One such way "is via electronic mail, or 'e-mail', comparable in principle to sending a first class letter. One can address and transmit a mes-

---

**3.** In Footnote # 1 of its Memorandum in Support of its Motion for Reconsideration, Cyber takes exception to the Court's characterization of its e-mail in this manner. Yet, it was Cyber's own sets of examples which we found to be most representative of get-rich-quick ads, weight loss ads, health aid promises and phone sex services!

**4.** In our Memorandum Opinion of November 4, 1996, we found the number of AOL subscribers to total approximately six million. We now amend that number to seven million.

sage to one or more other people." *Id.* at 834.

24. "[T]he content on the Internet is as diverse as human thought." *Id.* at 842.

25. "Communications over the Internet do not 'invade' an individuals's home or appear on one's computer screen unbidden. Users seldom encounter content 'by accident.'" *Id.* at 844.

26. Unlike a radio or television, "the receipt of information on the Internet requires a series of affirmative steps more deliberate and directed than merely turning a dial." *Id.* at 845.

In its motion for reconsideration, Cyber contends "that the Court overlooked other, indeed critical, findings in *Reno* which are essential to a resolution of this dispute." Memorandum in Support of Motion for Reconsideration at 3. Specifically, Cyber contends that "the Court did not explicitly recognize several of the Internet's most important features, its speed, its low cost, and its open accessibility to the public and thus did not explain *why* the Internet is unique." *Id.* at 5 (emphasis in original).

We adopted only the findings in *Reno* which we believed were germane to the First Amendment issue before us. In doing so, we took extra care to make sure we adopted those findings in *Reno* which were emphasized by Cyber in its papers. Of course, now that Cyber has hired new counsel, it is asking the Court to adopt additional findings in *Reno* which it believes will help its case. Although we are under no obligation to do so in the context of a motion for reconsideration, we will nevertheless adopt the following findings in *Reno* in order to have a complete record:

27. "[Communications over the Internet] can occur almost instantaneously, and can be directed either to specific individuals, to a broader group of people interested in a particular subject, or to the world as a whole." *Reno*, 929 F.Supp. at 831.

28. "Full access to the online service (including access to the Internet) can be obtained for modest monthly or hourly fees." *Id.* at 833.

29. ".... the Internet provides an easy and inexpensive way for a speaker to reach a large audience, potentially of millions." *Id.* at 843.

30. ".... unlike traditional media, the barriers to entry as a speaker on the Internet do not differ significantly from the barriers to entry as listener." *Id.*

31. "The types of content now on the Internet defy easy classification. The entire card catalog of the Carnegie Library is online, together with journals, journal abstracts, popular magazines, and titles of compact discs.... It is no exaggeration to conclude that the content on the Internet is as diverse as human thought." *Id.* at 842.

Cyber also has submitted yet another "Declaration of Sanford A. Wallace" in support of its motion for reconsideration. The Court has reviewed the declaration and finds that it simply contains additional proposed "facts" in the form of self-serving opinions about the Internet in general and e-mail in particular, the basis of which were readily available to Cyber at the time it entered into the Stipulation of Facts with AOL. Accordingly, we will not consider the declaration in disposing of Cyber's motion for reconsideration. *Harsco Corp., supra.*

Throughout this litigation, Cyber has insisted that once AOL decided to provide its subscribers with Internet e-mail boxes so that they could send and receive e-mail over the Internet, AOL's Internet accessway became a public system subject to the First Amendment because the Internet itself is a public system. We rejected this contention in our previous Memorandum. Memorandum Opinion at 441–43. In its motion for reconsideration, Cyber backs away from its contention that AOL's Internet accessway constitutes a strictly public system and now contends that because "AOL made the business decision to provide its members Internet e-mail, and access to the Internet as a whole ... AOL shifted from a purely private to a mixed private and public system." Memorandum in Support of Motion for Reconsideration at 4.

We are not aware of any decision which has recognized Cyber's so-called "mixed pub-

lic and private system." We recognize that the Internet involves public characteristics in that tens of millions of people with access to the Internet can communicate and exchange ideas and information. However, neither the Internet itself nor AOL's accessway to the Internet involve the exercise of any of the municipal powers or public services traditionally exercised by the State so as to constitute a *public system for purposes of the First Amendment.* See, *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). As we noted in our Memorandum Opinion and Order of November 4, 1996, the Internet is nothing more than a " 'global Web of linked networks and computers' " which exists and functions as the result of the desire of hundreds of thousands of computer operators and networks to use common data transfer protocol to exchange communications and information. Memorandum Opinion at 13 quoting *Reno,* 929 F.Supp. at 832. No single entity, including the State, administers the Internet. *Id.* The parties have stipulated that "the constituent parts of the Internet . . . are owned and managed by private entities and persons, corporations, educational institutions and government entities, who cooperate to allow their constituent parts to be interconnected by a vast network of phone lines." Stipulation of Facts at ¶ 10. In addition, AOL has not opened its own private accessway to the public by performing any municipal power or essential public service.

Cyber also contends that the posture of the case *sub judice* is very different from the "shopping center" cases, particularly *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972) on which we relied, in part, in concluding that AOL's activities are not imbued with state action.

In its original papers, Cyber argued that AOL's Internet e-mail connection constituted an exclusive public function because there are no alternative avenues of communication for Cyber to send its e-mail to AOL members. In support for this proposition, Cyber relied on a series of Supreme Court cases including, *Lloyd.*

In *Lloyd,* a group of individuals sought to distribute handbills in the interior of a privately owned shopping center. The content of the handbills was not directed at any one establishment in the shopping center but instead was directed at the Vietnam War. The Court noted that, unlike the situation in a prior case, *Amalgamated Food Employees Union v. Logan Valley Plaza,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968) where the protestors had no other alternative to convey their message at the single establishment in the shopping center, the protesters in *Lloyd* could distribute their message about the Vietnam war on any public street, sidewalk or park outside the mall. The Court therefore found that "[i]t would be an unwarranted infringement of property rights to require [the protesters] to yield to the exercise of First Amendment under circumstances where adequate alternative avenues of communication exist." *Lloyd,* 407 U.S. at 567, 92 S.Ct. at 2228. The *Lloyd* Court went on to reject the individuals' functional equivalency argument, finding that the private shopping center neither assumed the full spectrum of municipal powers nor stood in the shoes of the state, as did the private company in *Marsh.* The Court held that, "[t]he First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on *state* action, not on action by the owner of private property used nondiscriminatorily for private purposes only." *Lloyd,* 407 U.S. at 567, 92 S.Ct. at 2228 (emphasis in original).

In our Memorandum Opinion of November 4, 1996 we noted that as in *Lloyd,* Cyber has numerous alternative avenues of sending its advertising to AOL members. Specifically, we stated:

An example of another avenue Cyber has of sending its advertising to AOL members over the Internet is the World Wide Web which would allow access by Internet users, including AOL customers, who *want* to receive Cyber's e-mail. Examples of non-Internet avenues include the United States mail, telemarketing, television, cable, newspapers, magazines and even passing out leaflets. Of course, AOL's decision to block Cyber's e-mail from reaching AOL's members does not prevent Cyber from sending its e-mail advertisements to the members of competing commercial on-

line services, including CompuServe, the Microsoft Network and Prodigy.

Memorandum Opinion and Order at 443–44.

In its motion for reconsideration, Cyber contends that "[t]wo points were essential to the ruling in *Lloyd* that the particular shopping center had not dedicated its premises to public use in a way which created a First Amendment right to distribute handbills protesting the Vietnam War." Memorandum in Support of Motion for Reconsideration at 8. First, according to Cyber, the Court observed that the distribution of handbills protesting the Vietnam War was unrelated to the principal business of the shopping center and the handbills could have been distributed to the same audience on any public street, building or park. Cyber contends that, unlike the situation in *Lloyd,*

> .... transmitting information *is* the business of the Internet. AOL voluntarily connected itself to the Internet and provided its members with Internet e-mail addresses for that very purpose. By doing so, it has agreed to participate in this system of communication, and it has succeeded in attracting seven million subscribers by doing so. It has voluntarily chosen to enable its customers not only to send, but also to receive Internet e-mail. It has, therefore, invited the transmission of an almost endless diversity of information over which it cannot and indeed does not purport to exercise any control or editorial discretion ... Thus, unlike the situation in *Lloyd* where the handbilling was unrelated to the principal business of the shopping center, in this case, Cyber is doing nothing more than that which AOL has specifically invited the public to do—send information to its subscribers.

Memorandum of Law in Support of Motion for Reconsideration at 9. (emphasis in original).

While AOL may have "specifically invited" the public to send e-mail to its subscribers over the Internet, it has never invited another private company such as Cyber to overload AOL's e-mail servers with as many as 1.9 million e-mail advertisements each day[5] without paying AOL any fee whatsoever for the imposition. The parties have stipulated that AOL's servers have a finite capacity. Stipulation of Facts at ¶ 7. The daily deluge of e-mail advertisements AOL receives over its servers only ends up clogging AOL's servers and causing complaints from many of AOL's subscribers. Indeed, as we noted in our Memorandum Opinion of November 4, 1996, we have "received a plethora of letters from disgruntled AOL members who object to having to receive Cyber's unsolicited e-mail whenever they sign on to AOL despite repeated attempts to be removed from Cyber's lists." Memorandum Opinion at 438.

If anything, the intrusion on AOL's subscribers is much more severe than was the intrusion on the patrons of the shopping center in *Lloyd.* In *Lloyd,* the protestors sought to distribute handbills in several different places on the mall walkways of the privately owned shopping center. Obviously, the protestors could not be stationed at every conceivable space within the shopping center, thereby allowing any patron visiting the center to avoid the protestors if they so desired. In the case *sub judice,* on the other hand, there is no way other than through AOL's own Preferred–Mail System[6] for a subscriber to avoid being deluged by Cyber's e-mail every time they go online.

The second "essential point" present in *Lloyd* which Cyber contends distinguishes that case from the case *sub judice* is that in *Lloyd,* the Court found that the protestors had adequate alternative avenues of communication to distribute their handbills such as

---

**5.** AOL submitted an unrefuted affidavit to the Court as part of its opposition to Cyber's motion for a temporary restraining order on antitrust principles in which a UNIX Systems Administrator for AOL averred, *inter alia,* that from November 4 through November 11, 1996, Cyber has sent to AOL members more than 1.9 million e-mail messages per day.

**6.** AOL has recently implemented a system "tool" which it calls "Preferred–Mail—The Guard Against Junk E–Mail". This "tool" allows AOL to block all of Cyber's e-mail advertisements from reaching AOL's subscribers while at the same time allowing access to Cyber's advertisements to those AOL subscribers who *want* to view these advertisements by requiring them to check off a box on the screen captioned "I want junk e-mail!"

the public streets, sidewalks, parks and buildings outside the shopping center. Cyber contends that the alternative avenues of communication we found it has for disseminating its advertisements to AOL subscribers, including the World Wide Web, the United States mail, telemarketing, television, cable, newspapers, magazines and passing out leaflets, are not *adequate* alternative avenues because none of them have the "unique attributes of e-mail as a communications medium." Memorandum of Law in Support of Motion for Reconsideration at 10. Specifically, Cyber contends that unlike listservs, newsgroups, chat lines, telnet, ftp, gopher and the World Wide Web which "require an affirmative action by the recipient in order to obtain information over the Internet", e-mail places the message "directly in the 'hands' of the intended recipient, who can choose whether to read it or not." *Id.*

In the first instance, AOL has not actually excluded Cyber from having access to AOL's system. Cyber is continuing to send its e-mail advertisements to AOL's servers. By implementing its PreferredMail system, AOL has given its own subscribers the option of viewing Cyber's e-mail without them having to sift through and erase the e-mail every time they go online. Thus, Cyber is only being denied the access to AOL's subscribers in a manner which it prefers.

In any event, having adequate alternative means of communication available, however, does not mean having identical means of communication. Otherwise, the word "alternative" would lose its significance. All of the above-mentioned alternative avenues of communication, while maybe not as quick and cheap as direct e-mail, would nevertheless allow Cyber to disseminate its e-mail advertisements in a manner which would not interfere with AOL's private property rights and the rights of its subscribers.

Finally, Cyber conveniently overlooks the most adequate alternative avenue available for it to send its e-mail advertisements to AOL's subscribers. Cyber could use its servers to create its own commercial online internet service or advertising web site and attempt to lure away AOL subscribers. Of course, Cyber will no doubt not favor this alternative because it would then have to pay its own way to reach AOL's subscribers. Given that adequate alternative avenues of communication exist for Cyber to reach AOL's subscribers, we find that it would be an unwarranted infringement of AOL's property rights for it to have to receive Cyber's mass e-mail advertisements over its private system.

For these reasons, we find that the case *sub judice* is not different from *Lloyd* in the manner Cyber suggests and that AOL has not dedicated its property to the public in a way which gives Cyber a right under the First Amendment to send its unsolicited e-mail advertisements to AOL's subscribers.

Relying primarily on the Supreme Court's decisions in *Turner Broadcasting Sys., Inc. v. Federal Communications Comm.*, 512 U.S. 622, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) and *Associated Press v. United States*, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), Cyber next argues that AOL exercises a constitutionally impermissible bottleneck over a critical pathway of communication. This argument is essentially the same one Cyber made in its most recent application for a temporary restraining order on antitrust principles.

In *Associated Press*, an association of newspapers had established by-laws prohibiting distribution of Associated Press news to non-member newspapers and allowing a competing newspaper a virtual veto right over admission of new members. Those by-laws, which allowed competing newspapers to starve out non-members from news essential to be competitive (thus restricting the output of news), were held to violate Section 1 of the Sherman Antitrust Act because they permitted competitors to cut down their own competition. The Court further found that, on the facts before it, the First Amendment guarantee of freedom of the press did not prevent application of the Sherman Act. The Court reasoned:

> Freedom to publish means freedom for all and not for some. Freedom to publish is guaranteed by the Constitution but freedom to combine to keep others from publishing is not. Freedom of the press from governmental interference under the First

Amendment does not sanction repression of that freedom by private interests. The First Amendment affords not the slightest support for the contention that a combination to restrain trade in news and views has any constitutional immunity.

*Associated Press,* 326 U.S. at 20, 65 S.Ct. at 1425. The issue *sub judice,* of course, does not involve application of the Sherman Act or any allegation that private interests in the form of a combination to restrain trade has prevented Cyber from having access to AOL's system.

The issue in *Turner* was whether certain provisions of the Cable Television Consumer Protection and Competition Act of 1992 known as "must-carry" provisions which required cable television systems to carry local broadcast television stations abridged the freedom of speech or press in violation of the First Amendment. In evaluating whether the must-carry provisions ran afoul of the First Amendment, the Court first had to determine the degree of scrutiny to which the provisions should be subject. The Court rejected the cable operators argument that the provisions should be subject to strict scrutiny, finding that the provisions did "not pose such inherent dangers to free expression, or present such potential for censorship or manipulation, as to justify application of the most exacting level of First Amendment scrutiny." *Turner Broadcasting,* at 661, 114 S.Ct. at 2469. Instead, the Court concluded that "the appropriate standard by which to evaluate the constitutionality of must-carry is the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech." *Id.* The Court also observed that the must-carry provisions served important government interests by preserving free broadcast television, by promoting widespread dissemination of information and by promoting fair competition in the market for television programming. *Id.* The Court concluded, however, that genuine fact issues precluded it from ultimately deciding the constitutionality of the must-carry provisions.

Cyber seizes upon language in a section of the *Turner* opinion where the Supreme Court was discussing the technological differ-ence between newspapers and cable television. Specifically, the Court stated:

> When an individual subscribes to cable, the physical connection between the television set and the cable network gives the cable operator bottleneck, or gatekeeper, control over most (if not all) of the television programming that is channeled into the subscriber's home. Hence, simply by virtue of its ownership of the essential pathway for cable speech, a cable operator can prevent its subscribers from obtaining access to programming it chooses to exclude. A cable operator, unlike speakers in other media, can thus silence the voice of competing speakers with a mere flick of the switch.

> The potential for abuse of this private power over a central avenue of communication cannot be overlooked.... The First Amendment's command that government not impede the freedom of speech does not disable the government from taking steps to ensure that private interests not restrict, through physical control of a critical pathway of communication, the free flow of information and ideas. See *Associated Press v. United States,* 326 U.S. at 20, 65 S.Ct. at 1425.

*Turner Broadcasting,* at 656–57, 114 S.Ct. at 2466.

Applying this language to the case *sub judice,* Cyber argues that "speed, low cost and access to millions of people make the Internet a 'critical pathway of communication'". Memorandum of Law in Support for Motion for Reconsideration at 19–20. Cyber then asserts that "AOL has exclusive physical control over this 'pathway' (or channel) of information and ideas from the Internet to its subscribership of approximately seven million people." *Id.* Thus, in one sentence Cyber argues that it is the Internet itself which is a "critical pathway of communication" while in the very next sentence Cyber argues that it is the channel from the Internet to AOL's subscribership which is the critical pathway.

The Internet may indeed some day be found to be a critical pathway of communication. However, AOL has never sought to control the exchange of ideas and communi-

cations over the Internet itself. Rather, AOL has sought to control its own pathway or channel leading to the Internet in order protect its own private property, reputation and subscribers from Cyber's mass e-mail advertisements.[7] In our Memorandum Opinion and Order of November 26, 1996, 948 F.Supp. 456, we explained the serious deficiencies with Cyber's contention that AOL's channel or pathway to the Internet constituted an "essential facility" or "critical pathway of communication". Specifically, we noted the many reasons why AOL's channel or pathway to the Internet was not essential or critical to Cyber as follows:

> In the first instance, as mentioned above, AOL has not even completely excluded Cyber from the AOL system. AOL's Preferred Mail simply gives the AOL subscriber the option to choose whether he wishes to view Cyber's e-mail advertisements. In addition, AOL currently has approximately seven million members who constitute no more than one-sixth to one-seventh of the current total e-mail population of 40 to 50 million and approximately one-half of the current total online population of 12 million. Cyber also has many other means of disseminating its advertising to Internet users in general and to AOL subscribers in particular besides electronic mail. Cyber can send its advertisements to the subscribers of the many other online services which compete with AOL, including CompuServe, the Microsoft Network and Prodigy. Cyber can send its advertisements to AOL members over the Internet through the World Wide Web which would allow access by AOL subscribers who want to receive Cyber's advertisements. Cyber, as an advertising agency, can disseminate its advertisements to AOL subscribers and others by non-Internet means including the United States mail, telemarketing, television, cable, newspapers, magazines, billboards and

leaflets. And, of course, Cyber could attempt to lure AOL subscribers away from AOL by developing its own commercial online system or advertising web site and charging a competitive rate.

Memorandum Opinion of November 26, 1996 at 15–16, at 463. In short, AOL's accessway or pathway to the Internet is not any more a critical pathway of communication than are the accessways to the Internet of the online companies which compete with AOL including CompuServ, Prodigy, the Microsoft Network, AT & T, MCI Communications and Sprint.

In addition, the situation in *Turner* involving cable television which prompted the Court to write the language relied on by Cyber is entirely different than the situation in the case *sub judice* involving the Internet and commercial online services. Unlike cable television which, as the *Turner* Court noted, allows the cable operator by virtue of its ownership of the essential pathway for cable speech to prevent its subscribers from obtaining access to programming which it chooses to exclude, subscribers of commercial online services are not restricted to any one service for access to the Internet but instead can readily choose among numerous competing commercial online services including AOL, CompuServ, Prodigy, the Microsoft Network, AT & T, MCI Communications and Sprint as well as several smaller services. Of course, one can also access the Internet with just a computer, modem and service provider. A commercial online service, no matter how many subscribers it may have, does not obstruct the subscribers access to other competing online services. Thus, the commercial online services exercise far less control over access to the Internet than the control a cable operator exercises over access to cable television. The *Turner* decision is simply not applicable.

---

**7.** That AOL is not attempting to stifle communications over the Internet but instead is merely trying to protect its own private property can best be illustrated by the analogy AOL poses in Footnote 3 of its opposition brief. According to AOL, AOL's private system is akin to a private resort swimming pool that has a "channel" leading to the "ocean" that is the Internet. AOL has permitted persons swimming in its "pool" to transmit messages to and receive messages from the Internet ocean. AOL has, however, taken steps to prevent sharks such as Cyber from entering AOL's pool from the Internet ocean. At no time has AOL contended that it controls communications over the Internet ocean, but only that it controls its own private channel.

To recap, the Supreme Court has stated that "the guarantees of free speech ... guard only against encroachment by the government and 'erec[t] no shield against merely private conduct.'" *Hurley v. Irish–American Gay Group of Boston,* —— U.S. ——, ——, 115 S.Ct. 2338, 2344, 132 L.Ed.2d 487 (1995) (citation omitted). Because AOL is a private company and its e-mail servers are AOL's private property and because neither the Internet nor AOL's accessway to the Internet are public systems within the meaning of the First Amendment, a private company such as Cyber simply does not have the unfettered right under the First Amendment to invade AOL's private property with mass e-mail advertisements. Put another way, the First Amendment does not prevent AOL from using its PreferredMail System to protect its private property rights by blocking Cyber's mass e-mail advertisements from clogging AOL's system and damaging AOL's reputation while at the same time not receiving any compensation whatsoever from Cyber.

### ORDER

The motion of Cyber Promotions, Inc. for reconsideration of our Memorandum Opinion and Order of November 4, 1996 is DENIED.

Pursuant to 28 U.S.C. § 1292(b), the following question is certified for an immediate appeal: Whether, under the First Amendment to the United States Constitution, one private company has the unfettered right to send unsolicited e-mail advertisements over the Internet to the e-mail servers of a private online company and whether the private online company has the right to block the e-mail advertisements from reaching its members.

The Court is of the opinion that the foregoing involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this Order may materially advance the ultimate termination of the litigation.

The motion of plaintiff Cyber Promotions, Inc. for clarification is DENIED.

The motion of plaintiff Cyber Promotions, Inc. for reinstatement is DENIED.

The motion of plaintiff Cyber Promotions, Inc. for transfer is DENIED.

The motion of defendant Cyber Promotions, Inc. for transfer is DENIED.

IT IS SO ORDERED.