114 Cal.Rptr.2d 244 (2001)
94 Cal.App.4th 325
INTEL CORPORATION, Plaintiff and Respondent,
v.
Kourosh Kenneth HAMIDI, Defendant and Appellant.
No. C033076.
Court of Appeal, Third District.
December 10, 2001.
Review Granted March 27, 2002.
*246 Philip H. Weber, Placerville, for Defendant and Appellant.
Ann Brick for American Civil Liberties Union Foundation of Northern California; Christopher A. Hansen for American Civil Liberties Union Foundation, New York; and Deborah Pierce for Electronic Frontier Foundation, Amici Curiae for Defendant and Appellant.
Morrison & Foerster, Linda E. Shostak, Michael A. Jacobs, San Francisco, and Kurt E. Springmann, San Diego, for Plaintiff and Respondent.
*245 MORRISON, J.
After Kourosh Kenneth Hamidi was fired by Intel Corporation, he began to air grievances about the company. Hamidi repeatedly flooded Intel's e-mail system. When its security department was unable to block or otherwise end Hamidi's mass emails, Intel filed this action. The trial court issued a permanent injunction stopping the campaign, on a theory of trespass to chattels.
On appeal Hamidi, supported by Amici Curiae Electronic Frontier Foundation (EFF) and American Civil Liberties Union (ACLU), urges trespass to chattels was not proven and, even if it was, the injunction violates free speech principles which require the elements of the tort be tempered in cases involving speech. We shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND
Intel filed a brief complaint, alleging it maintains an internal, proprietary, e-mail system for use of its employees; the e-mail addresses are confidential; defendant Hamidi and FACE-Intel (Former and Current Employees of Intel, a defaulting party which did not appeal) obtained Intel's e-mail address list and on several occasions sent e-mail to up to 29,000 employees; on March 17, 1998, Intel sent a letter demanding Hamidi stop, but he refused. The complaint sought remedies based on theories of nuisance and trespass to chattels.
Intel moved for summary judgment and submitted a set of undisputed facts which Hamidi did not dispute. They establish: Hamidi is the FACE-Intel webmaster and spokesperson. He sent e-mails to between 8,000 and 35,000 Intel employees on six specific occasions. He ignored Intel's request to stop and took steps to evade its security measures. Intel's employees "spend significant amounts of time attempting to block and remove HAMIDI's e-mail from the INTEL computer systems," which are governed by policies which "limit use of the e-mail system to company business."
Hamidi filed a declaration in opposition to summary judgment, explaining "FACE-INTEL was formed to provide a medium for INTEL employees to air their grievances and concerns over employment conditions at INTEL. FACE-INTEL provides an extremely important forum for employees within an international corporation to communicate via a web page on the *247 Internet and via electronic mail, on common labor issues, that, due to geographical and other limitations, would not otherwise be possible." His six mass e-mailings "did not originate on INTEL property, nor were they sent to INTEL property. The electronic mails were sent over the internet to an internet server. [¶] With each of the electronic mailings [he] informed each recipient that [he] would remove them from the mailing list upon request. [He] only received 450 requests[.]"
Intel dropped its nuisance theory and claim for damages, and the trial court granted summary judgment. It issued an injunction that "defendants, their agents, servants, assigns, employees, officers, directors, and all those acting in concert for or with defendants are hereby permanently restrained and enjoined from sending unsolicited e-mail to addresses on INTEL's computer systems." Hamidi timely appealed.

STANDARD OF REVIEW
We review the judgment de nov o. (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 860, 107 Cal.Rptr.2d 841, 24 P.3d 493; Jackson v. Ryder Truck Rental, Inc. (1993) 16 Cal.App.4th 1830, 1836, 20 Cal.Rptr.2d 913; see Code Civ. Proc., § 437c, subd. (c) & subd. (o)(2).)

DISCUSSION

I. Intel Proved Hamidi Trespassed to its Chattels

The common law adapts to human endeavor. For example, if rules developed through judicial decisions for railroads prove nonsensical for automobiles, courts have the ability and duty to change them. (See generally, Keller, Condemned to Repeat the Past: The Reemergence of Misappropriation and other Common Law Theories of Protection for Intellectual Property (1998) 11 Harv.J.L. & Tech. 401, 403-406, 423-26.)
Trespass to chattels is somewhat arcane and suffers from desuetude. "The chief importance of the theory today, according to Prosser, is that there may be recovery for interferences with the possession of personal property that are not sufficiently important to be classed as conversion, i.e., as a `little brother of conversion.'" (5 Witkin, Summary of Cal. Law (9th ed.1988, 1999 Supp.) Torts, § 627A, p. 390; see id., § 610, pp. 707-708.) However, the tort has reemerged as an important rule of cyberspace.
We begin with Prosser, who explains: "The earliest cases in which the action of trespass was applied to chattels involved asportation, or carrying off, and a special form of the writ, known as trespass de bonis asportatis, was devised to deal with such situations. Later the action was extended to include cases where the goods were damaged but not takenas where animals were killed or beaten. Later decisions extended the tort to include any direct and immediate intentional interference with a chattel in the possession of another. Thus it is a trespass to damage goods or destroy them, to make an unpermitted use of them, or to move them from one place to another." (Prosser and Keeton, Torts (5th ed. 1984) Trespass to Chattels, § 14, p. 85, fns. omitted.)
Although there was litigation over who could bring suit and over formal pleading requirements, the shape of the tort is simple. A leading American court approved this definition: "1. To constitute a trespass, there must be a disturbance of the plaintiffs possession. 2. The disturbance may be by an actual taking, a physical seizing or taking hold of the goods, removing them from their owner, or by exercising a control or authority over them inconsistent with their owner's possession." *248 (Holmes v. Doane (1855) 69 Mass. 328, 329.) The most common application is for a physical taking, even if momentary. (See Tubbs v. Delk (Mo.Ct.App.1996) 932 S.W.2d 454 [taking camera for five minutes, returning it with film intact].)
The Restatement is in accord, providing "A trespass to a chattel may be committed by intentionally ... (b) using or intermeddling with a chattel in the possession of another." (Rest.2d Torts, § 217, p. 417.) Most cases involve concrete harm to a chattel, "actual impairment of its physical condition, quality or value to the possessor ... as distinguished from the mere affront to [the owner's] dignity as possessor[.]" (§ 218, com. h, p. 422 [allowing some exceptions, such as use of another's toothbrush].)
The Restatement also provides "The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel. In order that an actor who interferes with another's chattel may be liable, his conduct must affect some other and more important interest of the possessor. Therefore, one who intentionally intermeddles with another's chattel is subject to liability only if his intermeddling is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time, or some other legally protected interest [is harmed.] Sufficient legal protection of the possessor's interest in the mere inviolability of his chattel is afforded by his privilege to use reasonable force to protect his possession against even harmless interference. ... [¶] Illustration: [¶] 2. A, a child, climbs upon the back of B's large dog and pulls its ears. No harm is done to the dog, or to any other legally protected interest of B. A is not liable to B." (§ 218, com. e, pp. 421-422; see Glidden v. Szybiak (1949) 95 N.H. 318, 320, 63 A.2d 233, 235.) This caveat speaks of "nominal damages." Intel does not seek damages, even nominal damages, to compensate for Hamidi's conduct; Intel wants to prevent him from repeating his conduct. In this case, the nature of the remedy sought colors the analysis.
"Originally, all types of trespass, including trespass to land, were punishable under the criminal law because the trespasser's conduct was regarded as a breach of the peace. When the criminal and civil aspects of trespass were separated, the civil action for trespass was colored by its past, and the idea that the peace of the community was put in danger by the trespasser's conduct influenced the courts' ideas of the character of the tort. Therefore, relief was granted to the plaintiff where he was not actually damaged, partly, at least, as a means of discouraging disruptive influences in the community. If then, there is an act on the part of the defendant interfering with the plaintiffs possession, which does or is likely to result in arousing conflict between them, that act will characterize the tort as a trespass, assuming of course that the other elements of the tort are made out." (7 Speiser et al, American Law of Torts (1990) Trespass, § 23:1, p. 592 (Speiser).)
The treatise just quoted states "As a number of very early cases show, any unlawful interference, however slight, with the enjoyment by another of his personal property, is a trespass." (Speiser, supra, § 23:23, p. 667.) The oldest case cited is Rand v. Sargent (1843) 23 Me. 326. Actually, "chasing cattle has been a trespass time out of mind" (Winfield & Jolowicz on Tort (10th ed. 1975) Trespass to Goods, p. 403), or at least since Jacobean times. (Farmer v. Hunt (1610) 1 Brown. & *249 Gold. 220 [123 Eng. Rep. 766]; see 1 Chitty on Pleading (7th Ed. [16th Amer. Ed.] 1876) Trespass, p. *193 ["hunting or chasing sheep, & c."].)
"A trespass to chattels is actionable per se without any proof of actual damage. Any unauthorised touching or moving of a chattel is actionable at the suit of the possessor of it, even though no harm ensues. So it is a trespass for a shop assistant to snatch a customer's handbag and detain it `for a few moments,' or to erase a tape-recording, or to show a private letter to an unauthorised person.... It may be very necessary for the protection of certain kinds of property, e.g., museum or art gallery exhibits, that this should be the law. Hence, the successful plaintiff will always be entitled to nominal damages at least[.]" (Salmond on Tort (21st ed. 1996) Trespass to Goods, § 6 .2, p. 95, fns. omitted.) Another treatise agrees that "any unpermitted contact with or impact upon another's chattel" is enough, but comments "Probably the courts will hold that direct and deliberate interference is trespass even if no damage ensues, but where the interference is by way of negligent or inadvertent contact, the general trend of recent judicial decisions and dicta in England suggest that there is a requirement of proof of special damage[.]" (Clerk & Lindsell on Torts (17th ed. 1995) Trespass, ¶ 13-159, p. 703, italics added; see Fleming, Law of Torts (9th ed.1998) Intentional Interference with Chattels, pp. 58-59 [questioning rule, but suggesting damage "however slight," would suffice, and acknowledging mere use of another's goods sufficed].)
As indicated, some confusion in the cases and treatises disappears when the nature of the remedy is considered. We accept that "The plaintiff, in order to recover more than nominal damages, must prove the value of the property taken, or that he has sustained some special damage." (1 Waterman, Trespass (1875) Remedy for Wrongful Taking of Property, § 596, p. 617; see Lay v. Bayless (1867) 44 Tenn. 246, 247; Warner v. Capps (1881) 37 Ark. 32.) Intel seeks no damages.
Hamidi's conduct was trespassory. Even assuming Intel has not demonstrated sufficient "harm" to trigger entitlement to nominal damages for past breaches of decorum by Hamidi, it showed he was disrupting its business by using its property and therefore is entitled to injunctive relief based on a theory of trespass to chattels. Hamidi acknowledges Intel's right to self help and urges Intel could take further steps to fend off his emails. He has shown he will try to evade Intel's security. We conceive of no public benefit from this wasteful cat-and-mouse game which justifies depriving Intel of an injunction. (Cf. America Online, Inc. v. Nat. Health Care Discount, Inc. (N.D.Iowa 2000) 121 F.Supp.2d 1255, 1259-1260 [detailing ongoing technological struggle between spammers and system operators].) Even where a company cannot precisely measure the harm caused by an unwelcome intrusion, the fact the intrusion occurs supports a claim for trespass to chattels. (See Register.com, Inc. v. Verio, Inc. (S.D.N.Y.2000) 126 F.Supp.2d 238, 249-250 [applying New York law, based on the Restatement, "evidence of mere possessory interference is sufficient to demonstrate the quantum of harm necessary to establish a claim for trespass to chattels"].)
Some commentators espouse the view that "cyberspace," as they term it, is necessarily free and open, minimizing the harm caused to Intel's business. (E.g., Comment, Developmentsthe Law of Cyberspace (1999) 112 Harv.L.Rev. 1574, 1633, fn. 137.) And Amicus ACLU urges "Harm flowing from the content of the *250 communication may not form the basis for an action for trespass to chattel." But Intel proved more than its displeasure with Hamidi's message, it showed it was hurt by the loss of productivity caused by the thousands of employees distracted from their work and by the time its security department spent trying to halt the distractions after Hamidi refused to respect Intel's request to stop invading its internal, proprietary e-mail system by sending unwanted e-mails to thousands of Intel's employees on the system. (See Hotmail Corporation v. Van$ Money Pie, Inc. (N.D.Cal.1998) 47 U.S.P.Q.2d (BNA 1020, 1025, ¶ 39, 1998 WL 388389, at p. *7 (Hotmail) [trespass caused "added costs for personnel"].)
"`Intermeddling' means intentionally bringing about a physical contact with the chattel." (Rest.2d Torts, § 217, com. e, p. 419.) "Electronic signals generated and sent by computer have been held to be sufficiently physically tangible to support a trespass cause of action. [Citations.] It is undisputed that plaintiff has a possessory interest in its computer systems. Further, defendants' contact with plaintiffs computers is clearly intentional. Although electronic messages may travel through the Internet over various routes, the messages are affirmatively directed to their destination ." (CompuServe Inc. v. Cyber Promotions Inc. (S.D.Ohio 1997) 962 F.Supp. 1015, 1021 (CompuServe).) "[A]ny value CompuServe realizes from its computer equipment is wholly derived from the extent to which that equipment can service its subscriber base.... To the extent that defendants' multitudinous electronic mailings demand the disk space and drain the processing power of plaintiffs computer equipment, those resources are not available to serve CompuServe subscribers. Therefore, the value of that equipment to CompuServe is diminished even though it is not physically damaged by defendants' conduct." (Id. at p. 1022.)
Amicus ACLU seeks to distinguish CompuServe on the ground the conduct "placed `a tremendous burden' on CompuServe's equipment thus depriving Compu-Serve of the full use of its equipment." Elsewhere in its brief, ACLU states Hamidi did not send "a large number of e-mails. All in all, he sent a total of only six e-mails over a period spanning close to two years." Similarly, Amicus EFF states: "Assuming the veracity of Intel's allegations, on six occasions over a nearly two-year period, many Intel employees simply had one additional e-mail from Mr. Hamidi sitting in their in boxes when they came to work in the morning. This hardly constitutes physical disruption to Intel's computer system." Amici discount disruption to Intel's business system, inasmuch as the thousands of employees had to confront, read, and delete the messages even if only to tell Hamidi to send them no more, as several hundred did.
EFF states if such loss of productivity "is the applicable standard [of harm], then every personal e-mail that an employee reads at work could constitute a trespass." The answer is, where the employer has told the sender the entry is unwanted and the sender persists, the employer's petition for redress is proper. Strangely, EFF, purporting to laud the "freedom" of the Internet, emphasizes Intel allows its employees reasonable personal use of Intel's equipment for sending and receiving personal e-mail. Such tolerance by employers would vanish if they had no way to limit such personal usage of company equipment.
CompuServe relied in part on Thrifty-Tel, Inc. v. Bezenek (1996) 46 Cal.App.4th 1559, 54 Cal.Rptr.2d 468 (Thrifty-Tel). Thrifty-Tel held the unauthorized use of telephone access numbers, which "overburdened *251 the system, denying some subscribers access," (p. 1564, 54 Cal.Rptr.2d 468) was sufficient to support liability for actual monetary damages. The case did not state or imply that such an extreme effect was required to establish the tort. Thrifty-Tel noted: "At early common law, trespass required a physical touching of another's chattel or entry onto another's land. The modern rule recognizes an indirect touching or entry; e.g., dust particles from a cement plant that migrate onto another's real and personal property may give rise to trespass. [Citing, inter alia, Wilson v. Interlake Steel Co. (1982) 32 Cal.3d 229, 185 Cal.Rptr. 280, 649 P.2d 922 (Wilson).] But the requirement of a tangible [trespass] has been relaxed almost to the point of being discarded. Thus, some courts have held that microscopic particles [citation] or smoke [citation] may give rise to trespass. And the California Supreme Court has intimated migrating intangibles (e.g., sound waves) may result in a trespass, provided they do not simply impede an owner's use or enjoyment of property, but cause damage. [Citing Wilson.] In our view, the electronic signals generated by the Bezenek boys' activities were sufficiently tangible to support a trespass cause of action." (46 Cal. App.4th at p. 1566, fn. 6, 54 Cal.Rptr.2d 468.) We agree.
Amicus EFF suggests Thrifty-Tel, supra, 46 Cal.App.4th 1559, 54 Cal.Rptr.2d 468 is based on the view "physical damages or physical disruption, even if temporary," "gives the `electronic signal' a sufficiently tangible quality to suppoit a cause of action for trespass," and Intel has not shown Hamidi's e-mails caused physical disruption. This is not so for two reasons. First, the footnote just quoted makes it plain that the electronic signal is "sufficiently tangible to support a trespass cause of action." The tangibility of the contact is not dependent on the harm caused. Second, Hamidi's e-mails caused disruption to Intel's workers, who were drawn away from their jobs to deal with the messages. If EFF is saying Hamidi can flood Intel's system to the penultimate extent before causing a computer crash, we disagree.
Hamidi insists this view of the Thrifty-Tel decision (supra, 46 Cal.App.4th 1559, 54 Cal.Rptr.2d 468) has been undermined by a subsequent California Supreme Court case, San Diego Gas & Electric Co. v. Superior Court (1996) 13 Cal.4th 893, 55 Cal.Rptr.2d 724, 920 P.2d 669 (San Diego Gas). We disagree. San Diego Gas held a civil action claiming damages from electromagnetic radiation emanating from power lines would not lie, as such a suit would trench on the jurisdiction of the Public Utilities Commission. The plaintiffs effectively abandoned their claim of personal injury, based on a fear of cancer, but pursued a trespass claim. (Id. at p. 935, 55 Cal.Rptr.2d 724, 920 P.2d 669.) The court reiterated the rule stated by the late Justice Frank K. Richardson, as follows: "`Noise alone, without damage to the property, will not support a tort action for trespass. Recovery allowed in prior trespass actions predicated upon noise, gas emissions, or vibration intrusions has, in each instance, been predicated upon the deposit of particulate matter upon the plaintiffs' property or on actual physical damage thereto. [Citations.] [¶] All intangible intrusions, such as noise, odor, or light alone, are dealt with as nuisance cases, not trespass. [Citations.] [¶] Succinctly stated, the rule is that actionable trespass may not be predicated upon nondamaging noise, odor, or light intrusion. ...'" (Id. at p. 936, 55 Cal.Rptr.2d 724, 920 P.2d 669, quoting Wilson, supra, 32 Cal.3d 229, 185 Cal.Rptr. 280, 649 P.2d 922.) Wilson and San Diego Gas involved claims of damage to realty, not chattels. Most importantly, San Diego Gas, quoting *252 from Wilson, spoke of "nondamaging" intrusions. In other words, it did not hold that the electromagnetic waves did not contact the land. Cases are not authority for points not considered. (Hart v. Burnett (1860) 15 Cal. 530, 598.)
In America Online, Inc. v. IMS (E.D.Va.1998) 24 F.Supp.2d 548, IMS "sent unauthorized bulk e-mail advertisements (`spam') to AOL subscribers," even after AOL (America Online) told IMS to stop. (Id. at p. 549.) Applying the common law of Virginia, the court granted summary judgment to AOL on its claim of trespass to chattels. The court relied in part on CompuServe to conclude AOL was harmed by the time spent processing the unwanted e-mail, and the burden to the computer equipment it caused. (Id. at p. 550; accord America Online, Inc. v. GreatDeals.Net (E.D.Va.1999) 49 F.Supp.2d 851, 864 .) In America Online, Inc. v. LCGM, Inc. (E.D.Va.1998) 46 F.Supp.2d 444, another judge of the same court held (at page 452): "The transmission of electrical signals through a computer network is sufficiently `physical' contact to constitute a trespass to property."
Quite recently, a California federal court reached a similar conclusion in eBay Inc. v. Bidder's Edge, Inc. (N.D.Cal.2000) 100 F.Supp.2d 1058, 1071: "Even if, as BE argues, its searches use only a small amount of eBay's computer system capacity, BE has nonetheless deprived eBay of the ability to use that portion of its personal property for its own purposes. The law recognizes no such right to use another's personal property."
Hamidi and EFF ask, if unwanted email can constitute a trespass, why isn't unwanted first-class mail a trespass? "`[T]he short, though regular journey from mailbox to trash can ... is an acceptable burden, at least as far as the Constitution is concerned.'" (Bolger v. Youngs Drug Products Corp. (1983) 463 U.S. 60, 72, 103 S.Ct. 2875, 2883, 77 L.Ed.2d 469, 481 [held, law against use of mail for advertising contraceptives invalid].) The issue is one of degree. As Hamidi impliedly concedes, he could not lawfully cause Intel's computers to crash, or overwhelm the system so that Intel's employees were unable to use the computer system. (See Hotmail, supra, 47 U.S.P.Q.2d (BNA) at p. 1025, ¶ 39, 1998 WL 388389, at p. *7 [threat to "fill[ ] up Hotmail's computer storage space and ... damage Hotmail's ability to service its legitimate customers"].) Nor could a person send thousands of unwanted letters to a company, nor make thousands of unwelcome telephone calls. (See Rowan v. United States Post Office (1970) 397 U.S. 728, 736-737, 90 S.Ct. 1484, 1490-1491, 25 L.Ed.2d 736, 743 [upholding statute allowing blocking of mail, "Everyman's mail today is made up overwhelmingly of material he did not seek from persons he does not know"; "To hold less would tend to license a form of trespass"].)
At oral argument counsel referred to Business and Professions Code section 17538.4, which prohibits entities from barraging a person or company with unwanted commercial e-mails. The statute shows the Legislature recognizes the distraction and harm caused by unwanted electronic communications. Nothing in the statute suggests any intent to eliminate the application of common law remedies, such as trespass to chattels, to electronic communications, nor to limit common law remedies to cases of commercial speech.
We conclude the summary judgment moving papers demonstrated Intel's entitlement to an injunction based on a theory of trespass to chattels.

II. The Injunction Comports with the Federal Constitution

Hamidi and Amici insist the injunction runs afoul of the First Amendment. *253 In like manner as the First Amendment trumps a state's power to make and enforce defamation torts (e.g., New York Times v. Sullivan (1964) 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (Sullivan)) they urge it governs a state's power to enjoin emails. This lawsuit does not implicate federal constitutional rights, for lack of state action.
Sullivan famously held "actual malice" was an element of the tort of libelas a matter of federal constitutional lawin a case where a political figure sued a newspaper. Sullivan pits common law rights protecting reputation against the constitutional right of a newspaper to publish. In a trespass case, however, the speaker's rights are pitted against a property owner's rightsof at least equal constitutional forceto wisely govern his lands (or, in this case, his chattels). The equation is different. (376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686.)
"[T]he First Amendment protects individuals only against government, not private, infringements upon free speech rights." (George v. Pacific-CSC Work Furlough (9th Cir.1996) 91 F.3d 1227, 1229.) When individuals seek protection for expressive rights, the "courts must first determine whether it is indeed government actionstate or federalthat the litigants are challenging." (Tribe, American Constitutional Law (2d ed. 1988) The Problem of State Action, § 18-1, p. 1688 (Tribe).) The case law is muddled. (See id., at p. 1690.) However, in some cases, including speech cases, a state-court decision in a suit between private litigants implicates federal concerns and "there seems little doubt that judges are government actors and that judicial remedies are state action." (Chemerinsky, State Action (1999) 618 PLI/Lit 183, 209 (Chemerinsky).)
Shelley v. Kraemer (1948) 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (Shelley), held judicial enforcement of racially restrictive real property covenants was state action. "[B]ut for the active intervention of the state courts, supported by the full panoply of state power, petitioners would have been free to occupy the properties in question without restraint." (Id. at p. 19, 68 S.Ct. at p. 844, 92 L.Ed at p. 1183.) The principle was applied to a speech case in Sullivan, which stated it "matters not that law has been applied in a civil action.... The test is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised." (376 U.S. at p. 265, 84 S.Ct. at p. 718, 11 L.Ed.2d at p. 697.)
But the Shelley reasoning (334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161) "consistently applied, would require individuals to conform their private agreements to constitutional standards whenever, as almost always, the individuals might later seek the security of potential judicial enforcement." (Tribe, supra, § 18-1 at p. 1697.) Such application would erode the distinction between public and private action. Thus, "Shelley remains controversial because ultimately everything can be made state action under it. If any decision by a state court represents state action, then ultimately all private actions must comply with the Constitution.... All private [suits for] violations of rights exist because state law allows them. It is difficult to imagine anything that cannot potentially be transformed into state action under this reasoning, [¶] The Court, of course, never has taken Shelley this far, but nor has it articulated any clear limiting principles." (Chemerinsky, supra, 618 PLI/Lit at p. 210.)
We need not delve too far into the state action morass. Judicial enforcement of neutral trespass laws has been held not to *254 constitute state action. "[T]his Court has never held that a trespasser or an uninvited guest may exercise general rights of free speech on property privately owned and used nondiscriminatorily for private purposes only." (Lloyd v. Tanner (1972) 407 U.S. 551, 568, 92 S.Ct. 2219, 2228, 33 L.Ed.2d 131, 142 (Lloyd).) Lloyd vacated an injunction permitting war protesters to exercise speech rights at a private shopping center. The court rejected the assertion that private property took on public character because it had characteristics "functionally similar to facilities customarily provided by municipalities." (Id. at p. 569, 92 S.Ct. at p. 2229, 33 L.Ed.2d at p. 142.) This argument "reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use." (Id. at p. 569, 92 S.Ct. at p. 2229, 33 L.Ed.2d at p. 143.)
Amicus ACLU suggests Lloyd, supra, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131, should be distinguished because the case declines rather than grants an injunction. But the court's act of declining an injunction to enable protestors to speak is functionally the same as granting an injunction preventing speech. (See Chemerinsky, supra, 618 PLI/Lit at p. 210 ["If the court dismisses the case because the state law does not forbid the violation, there is state action sustaining the infringement of the right, just as there would have been state action had the court dismissed the case in Shelley, [supra, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161]. All private violations of rights exist because state law allows them"]; see also Strickland, State Action Doctrine and the Rehnquist Court (1991) 18 Hastings Const. L.Q. 587, 606-607 ["Just as the creation and judicial application of law to grant judicial relief in civil litigation is state action, the state's decision to deny judicial or other intervention in private affairs is state action.... [T]he decision to deny relief, which is made by the state's official policymaking bodies, unquestionably is state action"].) Accordingly, the ability to use state trespass laws to enforce private property rights ... is irrelevant to the state action requirement of the Fourteenth Amendment. (International Socy. for Krishna Consciousness, Inc. v. Reber (C.D.Cal.1978) 454 F.Supp. 1385, 1388-1389; see Cape Cod Nursing Home v. Rambling Rose Rest Home (1st Cir.1981) 667 F.2d 238, 243 [police assistance in removing unwelcome guests does not create state action], followed by Radich v. Goode (3d Cir.1989) 886 F.2d 1391, 1398-1399.) As exclusivity is an attribute of private property, the owner may use the neutral trespass laws to enforce his decision so long as he has no other connection to state action. (2 Rotunda Nowak, Treatise on Constitutional Law (3d ed. 1999) State Action, 16.3, p. 786; cf. Comment, Maintaining Racial Segregation through State Criminal Trespass Actions (1963) 77 Harv. L.Rev. 127.)
Amicus ACLU cites cases which confer First Amendment protection in private tort actions, but they differ from the present case in that Hamidi was enjoined from trespassing onto Intels private property. (NAACP v. Claiborne Hardware Co. (1982) 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 [boycott activity]; Organization for a Better Austin v. Keefe (1971) 402 U.S. 415, 91 S.Ct. 1575/ 29 L.Ed.2d 1 (Keefe) [leafleting]; Blatty v. New York Times (1986) 42 Cal.3d 1033, 232 Cal.Rptr. 542, 728 P.2d 1177 [newspapers bestseller list]; Paradise Hills Associates v. Procel (1991) 235 Cal.App.3d 1528, 1 Cal.Rptr.2d 514 (Paradise Hills).) None of these cases hold the First Amendment permits trespassing. Paradise Hills reversed an injunction preventing a disgruntled homebuyer from protesting, but explains, had *255 she entered private property not open for public access, an injunction against such conduct would be appropriate. (Id. at p. 1547, 1 Cal.Rptr.2d 514.)
Cohen v. Cowles Media Co. (1991) 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586, cited by Hamidi, involved a newspapers breach of promise to a source; liability was not precluded by the First Amendment. The case did not address trespass.
Recent cases involving unwanted commercial e-mail support our view. In Cyber Promotions v. American Online, Inc. (E.D.Pa.1996) 948 F.Supp. 436 (Cyber Promotions), the court found no state action when an online company obtained an injunction to prevent another company from sending commercial e-mail to its members. The court rejected the e-mail sender's position that "`the Court's participation with the litigant in issuing or enforcing an order which impinges on another's First Amendment rights'" amounted to state action. (Id. at pp. 444-45.) CompuServe, which upheld an injunction against a company sending unsolicited emails, held squarely: "the mere judicial enforcement of neutral trespass laws by the private owner of property does not alone render it a state actor." (CompuServe, supra, 962 F.Supp. at p. 1026, cited on this point with approval Golden Gateway Center v. Golden Gateway Tenants Assn. (2001) 26 Cal.4th 1013, 1034 & fn. 14, 111 Cal.Rptr.2d 336, 29 P.3d 797 (plu.opn.) ["judicial enforcement of injunctive relief does not, by itself, constitute state action"] (Golden Gateway).) We agree.
At oral argument counsel asserted the California Supreme Court has held any judicial tort relief implicating expressive rights constitutes state action, relying on the following passage in Molko v. Holy Spirit Assn. (1988) 46 Cal.3d 1092 at page 1114, 252 Cal.Rptr. 122, 762 P.2d 46: "While judicial sanctioning of tort recovery constitutes state action sufficient to invoke the same constitutional protections applicable to statutes and other legislative actions [citing Sullivan], religious groups are not immune from all tort liability." That case involved claims by former cult members alleging that a religious group defrauded and falsely imprisoned them. The point of the passage just quoted was to emphasize that not all activities by religious groups are insulated from tort liability. Counsel's interpretation of the passage is tenable only if the language is divorced from its context.
For lack of state action the federal constitution is not implicated herein. Intel has the right to exclude others from speaking on its property. Intel is not required to exercise its right in a "content-neutral" fashion. Content discrimination is part of a private property-owner's bundle of rights. Intel does not welcome Hamidi.

III. The Injunction Comports with the State Constitution
Hamidi contends his right to send e-mail to Intel employees is protected by the California analog to the First Amendment, which provides "Every person may freely speak, write or publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, 2, subd. (a).) This provision is "more definitive and inclusive than the First Amendment]" (Wilson v. Superior Court (1975) 13 Cal.3d 652, 658, 119 Cal.Rptr. 468, 532 P.2d 116.)
In a controversial 4-3 decision, over a vigorous dissent, the California Supreme Court held the free speech rights of students obtaining petition signatures trumped the right of the owner of a shopping center to exclude them. (Robins v. Pruneyard Shopping Center (1979) 23 *256 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341 (Robins), affd. sub nom. PruneYard Shopping Center v. Robins (1980) 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741.) Robins concluded the shopping center served as a "functional equivalent for the suburban counterpart of the traditional town center business block, where historically the publics First Amendment activity was exercised and its right to do so scrupulously guarded." (Planned Parenthood v. Wilson (1991) 234 Cal.App.3d 1662, 1670, 286 Cal.Rptr. 427 (Planned Parenthood).) Robins rejected contrary authority construing the First Amendment on similar facts. (Lloyd, supra, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131.) Even under Robins, a large shopping center may impose time, place and manner restrictions. (Union of Needletrades, etc. Employees v. Superior Court (1997) 56 Cal.App.4th 996, 1009-1010, 65 Cal.Rptr.2d 838.)
But, "[b]y no means do we imply that those who wish to disseminate ideas have free rein.... `It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment.'" (Robins, supra, 23 Cal.3d at p. 910, 153 Cal.Rptr. 854, 592 P.2d 341.) Robins only diminishes a private property owners right to exclude others where the property "is generally open to the public and functions as the equivalent of a traditional public forum[.]" (Allred v. Harris (1993) 14 Cal.App.4th 1386, 1390, 18 Cal.Rptr.2d 530.)
The California Supreme Court recently reaffirmed the Robins holding. In Golden Gateway, supra, 26 Cal.4th 1013, 111 Cal.Rptr.2d 336, 29 P.3d 797, a majority concluded a large residential apartment complex could prevent its tenants from distributing leaflets within the complex. The plurality opinion of three justices would import the "state action" limitation into lawsuits based on the California Constitution's analog to the First Amendment. Three justices disagreed with this view and the Chief Justice declined to resolve the point. For our purposes we need not enter into that debate. Instead, we distill from Golden Gateway a holding which reaffirms the test employed in Robins. According to the plurality, "the actions of a private property owner constitute state action for purposes of California's free speech clause only if the property is freely and openly accessible to the public." (26 Cal.4th at p. 1033, 111 Cal.Rptr.2d 336, 29 P.3d 797.) Because the plurality concluded the complex was not freely and openly accessible to the public, it found no state action. The Chief Justice's opinion proceeds directly to the question whether the complex was "freely open" to the public and concluded it was not. (Id. at p. 1036, 111 Cal.Rptr.2d 336, 29 P.3d 797.) We perceive no semantic difference between "freely open" and "freely and openly accessible" to the public. Therefore actions to halt expressive activity on one's private property do not contravene the California Constitution unless the property is freely open to the public.
We recognize the open character of the Internet. "Although in its infancy, the Internet has already become a popular place of public discussion. Individuals from every part of American society visit and exchange ideas with others through various forums within cyberspace. The debate occurring in these forums in many ways embodies the Court's ideal of `uninhibited, robust, and wide-open' discussion." (Goldstone, A Funny Thing Happened on the Way to the Cyber Forum: Public v. Private in Cyberspace Speech (1998) 69 U. Colo. L.Rev. 1, 3.)
Private e-mail servers differ from the Internet; they are not traditional public *257 forums. (Cyber Promotions, supra, 948 F.Supp. at p. 446.) Nor is a private company which chooses to use e-mail made a public forum.
Although Intel is a large company, it is not like a Pruneyard Shopping Center, in that it is not a place where the public gathers to engage in expressive activity such as gathering signatures to petition the government, nor is its e-mail system so used. The Intel e-mail system is private property used for business purposes. Intel's system is not transformed into a public forum merely because it permits some personal use by employees. (See Perry Education Association v. Perry Local Educators Assn. (1983) 460 U.S. 37, 47, 103 S.Ct. 948, 956, 74 L.Ed.2d 794, 806 [limited access to outside organizations does not transform school mailbox system into a public forum].) Intel invites the public to use its e-mail system for and only for business purposes.
Hamidi insists Intel's act of connecting itself (and thus, its employees) to the Internet and giving its employees e-mail addresses makes Intel's e-mails a public forum. By the same reasoning, connecting one's realty to the general system of roads invites demonstrators to use the property as a public forum and buying a telephone is an invitation to receive thousands of unwanted calls. That is not the law. (CompuServe, supra, 962 F.Supp. at p. 1024; Cyber Promotions, supra, 948 F.Supp. at p. 442.) Intel is as much entitled to control its e-mail system as it is to guard its factories and hallways. No citizen has the general right to enter a private business and pester an employee trying to work. It may be a few unwanted e-mails would not be sufficient to trigger a court's equity powers. Indeed, such may be an inevitable, though regrettable, fact of modern life, like unwelcome junk mail and telephone solicitations. (See Cyber Promotions, Inc. v. Apex Global Information Svcs., Inc. (E.D.Pa.1997) 1997 WL 634384, p. *3 [bulk e-mail "annoying and intrusive"].) However, the massive size of Hamidi's campaign caused Intel much trouble, not the least of which was caused by the lost time of each employee who had to read or delete an unwanted message, either out of fear of a virus or a lack of desire to communicate with Hamidi. As we pointed out in another case, "When a camel's back is broken we need not weigh each straw in its load to see which one could have done the deed." (Woodland Joint Unified School Dist. v. Commission on Professional Competence (1992) 2 Cal. App.4th 1429, 1457, 4 Cal.Rptr.2d 227.)
Finally, Hamidi has many available alternate ways to reach his target audience. (Cf. Chico Feminist Women's Health Center v. Scully (1989) 208 Cal.App.3d 230, 243-248, 256 Cal.Rptr. 194. Cf. also Golden Gateway, supra, 26 Cal. 4th at p. 1050, 111 Cal.Rptr.2d 336, 29 P.3d 797 (dis.opn.) [concluding use of mail and off-site distribution were not feasible alternatives to door-to-door leafleting].)
We may safely assume most, if not all, Intel employees can reach Hamidi's website, either from their homes or from libraries or cafés which provide Internet access. Hamidi concedes the Internet has become widely accessible and affordable, at least in the United States. Employees who cannot get on the Internet can correspond with Hamidi about issues of mutual concern. According to Hamidi's website, [as of Dec. 10, 2001], he has delivered many thousands of printed "e-mails" to Intel's headquarters by horse and buggy, both to communicate with its workers within the terms of the injunction, and to publicize this lawsuit. (See www.intelhamidi.com/seconddelivery.htm [as of Dec. 10, 2001]. See also Gaum, E-Mail Delivered by Horse-Mail, *258 S.F. Chron. (Sep. 29, 1999) p. B-2 ["Mounted as an outrider and dressed in a red shirt and star-spangled kerchief, Hamidi handed 16 boxes of messages to Intel security officials"].) Hamidi may freely exchange ideas with Intel or Intel workers. This highlights a critical factual misstatement in Hamidi's brief, that he has been enjoined "from sending e-mail over the internet to Intel employees." The injunction prohibits Hamidi "from sending unsolicited e-mails to addresses on INTEL's computer systems." Hamidi is free to send mail"e" or otherwiseto the homes of Intel employees, and is free to send them regular mail. The injunction simply requires that Hamidi air his views without using Intel's private property.
The Chief Justice has cautioned that imposing a state action limitation on the free expression provisions of the California Constitution could allow a private actor "to censor or undermine what might be viewed as another individual's `core' free speech rights." (Golden Gateway, supra, 26 Cal.4th at p. 1042, 111 Cal.Rptr.2d 336, 29 P.3d 797.) He poses the example of an employer forbidding employees from displaying union bumper stickers in the employer's parking lot. (Ibid.)
That is not this case. Although Intel's workers may communicate with each other and outsiders to air grievances, they do not have a "core" right to spend company time doing so, such as by laying aside their work in order to respond to Hamidi's emails. Tellingly, ACLU views the e-mails to be in the control of the employees: "The decision whether or not to continue receiving Hamidi's messages should be that of the employee, not Intel." Hamidi states "Hamidi's e-mails may have been uninvited by Intel management, but they were not directed to Intel management." Intel owns the e-mail system it provides to its workers as much as it owns the telephones and manufacturing equipment it provides. The ACLU's position would result in employers denying all personal access to the Internet, which is not a sensible outcome.
We conclude the injunction does not violate the California Constitution.

DISPOSITION
The judgment is affirmed.
I concur: SCOTLAND, P.J.
Dissenting Opinion of KOLKEY, J.
I respectfully dissent. The majority would apply the tort of trespass to chattel to the transmittal of unsolicited electronic mail that causes no harm to the private computer system that receives it by modifying the tort to dispense with any need for injury, or by deeming the mere reading of an unsolicited e-mail to constitute the requisite injury. (Maj. opn. at pp. 249-250.)
While common law doctrines do evolve to adapt to new circumstances, it is not too much to ask that trespass to chattel continue to require some injury to the chattel (or at least to the possessory interest in the chattel) in order to maintain the action. The only injury claimed herethe time spent reading an e-mailgoes beyond any injury associated with the chattel or within the tort's zone of protection. Although I understand Intel's desire to end what it deems harassment by a disgruntled former employee, "[w]e must not throw to the winds the advantages of consistency and uniformity to do justice in the instance. We must keep within those interstitial limits which precedent and custom and the long and silent and almost indefinable practice of other judges through centuries of the common law have set to judge-made innovations." (Cardozo, The Nature of the Judicial Process (1921), p. 103, fn. omitted.)
*259 The other appellate decisions that have applied trespass to chattel to computer systems have done so only where the transmittal of the unsolicited bulk e-mail burdened the computer equipment, thereby interfering with its operation and diminishing the chattel's value (e.g., America Online, Inc. v. IMS (E.D.Va.1998) 24 F.Supp.2d 548, 550-551; America Online, Inc. v. LCGM, Inc. (E.D.Va.1998) 46 F.Supp.2d 444, 449; CompuServe, Inc. v. Cyber Promotions, Inc. (S.D.Ohio 1997) 962 F.Supp. 1015), or where the unauthorized search of, and retrieval of information from, another party's database reduced the computer system's capacity, slowing response times and reducing system performance (Register.com, Inc. v. Verio, Inc. (S.D.N.Y.2000) 126 F.Supp.2d 238, 250; eBay, Inc. v. Bidder's Edge, Inc. (N.D.Cal.2000) 100 F.Supp.2d 1058, 1066, 1071). But no case has held that the requisite injury for trespass to chattel can consist of the mere receipt of an e-mail, the only damage from which consists of the time consumed to read itassuming the recipient chooses to do so. To apply this tort to electronic signals that do not damage or interfere with the value or operation of the chattel would expand the tort of trespass to chattel in untold ways and to unanticipated circumstances.

A
California cases have consistently required actual injury as an element of the tort of trespass to chattel. (Zaslow v. Kroenert (1946) 29 Cal.2d 541, 551, 176 P.2d 1; Thrifty-Tel, Inc. v. Bezenek (1996) 46 Cal.App.4th 1559, 1566, 54 Cal.Rptr.2d 468; Itano v. Colonial Yacht Anchorage (1968) 267 Cal.App.2d 84, 90, 72 Cal.Rptr. 823.)
As most recently defined by the Court of Appeal in Thrifty-Tel, Inc. v. Bezenek, supra, "[t]respass to chattel, although seldom employed as a tort theory in California ..., lies where an intentional interference with the possession of personal property has proximately caused injury." (Thrifty-Tel, Inc. v. Bezenek, supra, 46 Cal.App.4th at p. 1566, 54 Cal.Rptr.2d 468, fn. omitted.) This definition was derived from Itano v. Colonial Yacht Anchorage, supra, 267 Cal.App.2d at page 90, 72 Cal.Rptr. 823, which, in turn, relied on Prosser's treatise on torts (Prosser) and the California Supreme Court's decisions in Jordan v. Talbot (1961) 55 Cal.2d 597, 610, 12 Cal.Rptr. 488, 361 P.2d 20, and Zaslow v. Kroenert, supra, 29 Cal.2d at page 551, 176 P.2d 1, which themselves relied on Prosser. Accordingly, I turn to Prosser to clarify the elements of the tort.
The present edition of Prosser cautions that trespass to chattel requires actual damage before the trespass is actionable: "Another departure from the original rule of the old writ of trespass concerns the necessity of some actual damage to the chattel before the action can be maintained. Where the defendant merely interferes without doing any harmas where, for example, he merely lays hands upon the plaintiffs horse, or sits in his carthere has been a division of opinion among the writers, and a surprising dearth of authority.... Such scanty authority as there is, however, has considered that the dignitary interest in the violability of chattels, unlike that as to land, is not sufficiently important to require any greater defense than the privilege of using reasonable force when necessary to protect them. Accordingly, it has been held that nominal damages will not be awarded, and that in the absence of any actual damage the action will not lie. This must be qualified, however, to the extent that any loss of possession by the plaintiff is regarded as necessarily a loss of something of value, even if only for a brief intervalso that *260 wherever there is found to be dispossession, as in the case of seizure of goods on execution, the requirement of actual damage is satisfied...." (Prosser and Keeton on Torts (5th ed.1984) § 14, p. 87, fns. omitted.)
The Restatement Second of Torts agrees on the need for actual damage for the tort to lie: "The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection by an action for nominal damages for harmless intermeddlings with the chattel. In order that an actor who interferes with another's chattel may be liable, his conduct must affect some other and more important interest of the possessor. Therefore, one who intentionally intermeddles with another's chattel is subject to liability only if his intermeddling is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time, or some other legally protected interest of the possessor is affected as stated in Clause (c)...." (Rest.2d Torts, § 218, com. e, pp. 421-122.)[1]
For that reason, where a child climbs on the back of another's dog and pulls its ears, but no harm is done to the dog or to the legally protected interest of the owner, the child is not liable. (Glidden v. Szybiak (1949) 63 A.2d 233, 95 N.H. 318; Rest.2d Torts, § 218, com. e, illus. 2, p. 422.) On the other hand, the intermeddling is actionable where the trespass impairs the value of the chattel, even if its physical condition is unaffected. (Rest.2d Torts, § 218, com. h, p. 422.) For instance, "the use of a toothbrush by someone else ... lead[s] a person of ordinary sensibilities to regard the article as utterly incapable of further use by him." (Ibid.)
The only possible exception to the requirement of actual injury is where there has been a loss of possession, which is viewed as a loss of something of value and thus actual damage: According to comment d of section 218 of the Restatement Second of Torts, "[w]here the trespass to the chattel is a dispossession, the action will lie although there has been no impairment of the condition, quality, or value of the chattel, and no other harm to any interest of the possessor." (Rest.2d Torts, § 218, com. d, p. 421.) This conforms with the observation in Prosser that "loss of possession by the plaintiff is regarded as necessarily a loss of something of value, even if only for a brief intervalso that wherever there is found to be dispossession ..., the requirement of actual damage is satisfied." (Prosser and Keeton on Torts, supra, § 14, p. 87, fns. omitted.)
Accordingly, in conformity with the California cases, section 218 of the Restatement Second of Torts requires actual injury in order to state a cause of action for trespass to chattelunless there is a loss of possession, which is deemed to constitute actual damage: "One who commits a trespass to a chattel is subject to liability to the possessor of the chattel if, but only if, [¶] (a) he dispossesses the other of the chattel, or [¶] (b) the chattel is impaired as to its condition, quality, or value, or [¶] (c) the possessor is deprived of the use of the chattel for a substantial time, or [¶] (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest." (Rest.2d Torts, § 218, p. 420.)

B
In this case, however, Intel was not dispossessed, even temporarily, of its email system by reason of receipt of e-mails; *261 the e-mail system was not impaired as to its condition, quality, or value; and no actual harm was caused to a person or thing in which Intel had a legally protected interest.
The majority nonetheless suggests that "[e]ven assuming Intel has not demonstrated sufficient `harm' to trigger entitlement to nominal damages ... it showed [the defendant] was disrupting its business by using its property and therefore is entitled to injunctive relief based on a theory of trespass to chattels." (Maj. opn. at p. 249.)
However, if the defendant's earlier transmittals of e-mail did not constitute harm, it is hard to understand what cognizable injury the injunction is designed to avoid. The fact the relief sought is injunctive does not excuse a showing of injury, whether actual or threatened. After all, injunctive relief requires a "showing that the defendant's wrongful act constitutes an actual or threatened injury to property or personal rights that cannot be compensated by an ordinary damage award." (5 Witkin, California Procedure (4th ed.1997) Pleading § 782, p. 239.) The majority therefore cannot avoid the element of injury by relying on the fact that injunctive relief is sought here.
Alternatively, the majority suggests that injury resulted from defendant's e-mails, because Intel "was hurt by the loss of productivity caused by the thousands of employees distracted from their work [by the e-mails] and by the time its security department spent trying to halt the distractions after [defendant] refused to respect Intel's request to stop ... sending unwanted e-mails." (Maj. opn. at p. 250.)
But considering first Intel's efforts to stop the e-mails, it is circular to premise the damage element of a tort solely upon the steps taken to prevent the damage. Injury can only be established by the completed tort's consequences, not by the cost of the steps taken to avoid the injury and prevent the tort; otherwise, we can create injury for every supposed tort.
Nor can a loss of employees' productivity (by having to read an unwanted e-mail on six different occasions over a nearly two-year period) qualify as injury of the type that gives rise to a trespass to chattel. If that is injury, then every unsolicited communication that does not further the business's objectives (including telephone calls) interferes with the chattel to which the communication is directed simply because it must be read or heard, distracting the recipient. "Damage" of this naturethe distraction of reading or listening to an unsolicited communicationis not within the scope of the injury against which the trespass-to-chattel tort protects, and indeed trivializes it. After all, "[t]he property interest protected by the old action of trespass was that of possession; and this has continued to affect the character of the action." (Prosser and Keeton on Torts, supra, § 14, p. 87.) Reading an e-mail transmitted to equipment designed to receive it, in and of itself, does not affect the possessory interest in the equipment.
Indeed, if a chattel's receipt of an electronic communication constitutes a trespass to that chattel, then not only are unsolicited telephone calls and faxes trespasses to chattel, but unwelcome radio waves and television signals also constitute a trespass to chattel every time the viewer inadvertently sees or hears the unwanted program.
At oral argument, Intel's counsel argued that the latter cases can be distinguished because Intel gave defendant notice of its objection before his final set of e-mails in September 1998. But such a notice could also be given to television and radio stations, *262 telephone callers, and correspondents. Under Intel's theory, even lovers' quarrels could turn into trespass suits by reason of the receipt of unsolicited letters or calls from the jilted lover. Imagine what happens after the angry lover tells her fiancé not to call again and violently hangs up the phone. Fifteen minutes later the phone rings. Her fiancé wishing to make up? No, trespass to chattel.
No case goes so far as to hold that reading an unsolicited message transmitted to a computer screen constitutes an injury that forms the basis for trespass to chattel. This case can be distinguished from cases like CompuServe Incorporated v. Cyber Promotions, Inc., supra, 962 F.Supp. at page 1022, America Online, Inc. v. IMS, supra, 24 F.Supp.2d 548, and America Online, Inc. v. LCGM, Inc., supra, 46 F.Supp.2d at page 449, where the district court found that unauthorized bulk e-mail advertisements (spam) to subscribers of an online service constituted trespass to chattels because the massive mailings "burdened [its] equipment" and diminished its good will and its possessory interest in its computer network. (America Online, Inc. v. IMS, supra, 24 F.Supp.2d at p. 550-551.) In CompuServe Incorporated v. Cyber Promotions, Inc., supra, 962 F.Supp. at page 1022, for instance, the court found that the defendants' "multitudinous electronic mailings demand[ed] the disk space and drain[ed] the processing power of plaintiff's computer equipment, [making] those resources ... not available to serve CompuServe subscribers" and led subscribers to terminate their accounts, harming Compu-Serve's business reputation and good will with its customers. (962 F.Supp. at pp. 1022, 1023.) Clearly, the defendants' bulk mailings injured the operation and value of the system.
Likewise, in Register.com, Inc. v. Verio, Inc., supra, 126 F.Supp.2d 238, and eBay, Inc. v. Bidder's Edge, Inc., supra, 100 F.Supp.2d 1058, the unauthorized search of, and retrieval of information from, another party's database was deemed to constitute trespass to chattel because the actions reduced the computer's capacity, slowing response times and reducing system performance.
Similarly, in Thrifty-Tel, Inc. v. Bezenek, supra, 46 Cal.App.4th at pages 1564-1566, 54 Cal.Rptr.2d 468, the Court of Appeal found trespass to chattel where the perpetrators' computer program cracked the plaintiff telephone carrier's access and authorization codes, allowing long distance phone calls to be made without paying for them. That, too, impaired the operation and the value of the owner's possessory interest in the chattel.
In each of these cases, the chattel, or the possessory interest therein, was impaired as to its condition or value.[2]
In contrast, here, the record does not suggest any impairment of the chattel's condition or value, or of the possessory interest therein.
Indeed, the extension of the tort of trespass to chattel to the circumstances here has been condemned by the academic literature. (Burk, The Trouble with Trespass (2000) 4 J. Small & Emerging Bus. L. 27, 39 ["the elements of common law trespass to chattels fit poorly in the context of cyberspace, and so the courts have been able to apply this claim to the problem of spam only by virtue of creative tailoring"]; *263 Ballantine, Computer Network Trespasses: Solving New Problems with Old Solutions (2000) 57 Wash. & Lee L.Rev. 209, 248 ["Ultimately, failure to allege or to support a showing of actual harm should have precluded Intel from prevailing on a trespass to chattels theory"].)
Even in cases involving trespass to land, for which nominal damages may be sought (Polin v. Chung Cho (1970) 8 Cal.App.3d 673, 676, 87 Cal.Rptr. 591), "`the rule is that actionable trespass may not be predicated upon nondamaging noise, odor, or light intrusion....' [Citation.]" (San Diego Gas & Electric Co. v. Superior Court (1996) 13 Cal.4th 893, 936, 55 Cal.Rptr.2d 724, 920 P.2d 669; emphasis added.) A fortiori, nondamaging electronic signals should not constitute trespass to chattel.
I acknowledge that the majority opinion contains a quote from an English treatise, Salmond and Heuston on the Law of Torts (21st ed. 1996) (Salmond), which states that "`trespass to chattels is actionable per se without any proof of actual damage,'" citing as examples the snatching of a customer's handbag for a few moments or the showing of a private letter to an unauthorized person. (Maj. opn. at p. 249, quoting Salmond, supra, § 6.2, p. 95.) But this proposition refers to the complete dispossession of chattel, which Prosser suggests satisfies the requirement of actual damage. (Prosser and Keeton on Torts, supra, § 14, p. 87.)
The majority also cites another English treatise, Clerk & Lindsell on Torts, that purportedly agrees with Salmond. But that treatise acknowledges that "[i]t has been judicially asserted that even an intentional interference without asportation is not actionable unless some harm ensues" and simply states that textbook writers argue to the contrary. (Clerk & Lindsell on Torts (17th ed. 1995) Trespass § 13-159, p. 703.).
To the extent that Salmond and Clerk & Lindsell state an unqualified view that actual damage is not required to state a cause of action for trespass to chattels, this is the minority view and has been questioned. (See I Harper, James, Gray, The Law of Torts, § 2.3, p. 2:14 [citing cases supporting the proposition that absent dispossession, "there must be some physical harm to the chattel or to its possessor" and calling into question the contrary position by Salmond].)
In conclusion, the overwhelming weight of authority is that trespass to chattel requires injury to the chattel or to the possessor's legally protected interest in the chattel. Opening and reading unsolicited e-mails is not a cognizable injury to the chattel or to the owner's possessory interest in it.[3]

C
One more issue remains to be addressed. If the transmittal of an unsolicited *264 e-mail that causes no injury to the condition, value, or operation of the chattel (or to the possessory interest therein) does not rise to the level of trespass to chattel, should the requirement of injury be relaxed to allow an injunction against unwanted e-mail?
While the common law can be adapted to new circumstances, it is not infinitely malleable. Relaxation of the injury requirement would not merely adapt the tort, but change its nature. After all, "[t]he property interest protected by the old action of trespass was that of possession; and this has continued to affect the character of the action." (Prosser and Keeton on Torts, supra, § 14, p. 87.) Dispensing with the requirement of injury to the value, operation, or condition of the chattel, or the possessory interest therein, would extend the tort's scope in a way that loses sight of its purpose.
"The reason that the tort of trespass to chattels requires some actual damage as a prima facie element, whereas damage is assumed where there is a trespass to real property, can be explained as follows: [¶] `The interest of a possessor of a chattel in its inviolability, unlike the similar interest of a possessor of land, is not given legal protection ... for harmless intermeddlings with the chattel. In order that an actor who interferes with another's chattel may be liable, his conduct must affect some other and more important interest of the possessor. Therefore, one who intentionally intermeddles with another's chattel is subject to liability only if his intermeddling is harmful to the possessor's materially valuable interest in the physical condition, quality, or value of the chattel, or if the possessor is deprived of the use of the chattel for a substantial time, or some other legally protected interest of the possessor is affected as stated in Clause (c). Sufficient legal protection of the possessor's interest in the mere inviolability of his chattel is afforded by his privilege to use reasonable force to protect his possession against even harmless interference.'" (CompuServe Incorporated v. Cyber Promotions, Inc., supra, 962 F.Supp. at p. 1023, citing Rest.2d Torts, § 218, com. e, original italics.)
The injury claimed herethe time spent reading an e-mailgoes beyond anything associated with the chattel or within the tort's zone of protection. Extension of the tort to protect against undesired communications, where neither the chattel nor the possessory interest therein is injured, transforms a tort meant to protect possessory interests into one that merely attacks speech. Regardless of whether restraining e-mails to a private company implicates First Amendment rights, such a metamorphosis of the tort is better suited for deliberate legislative action than judicial policymaking.
Indeed, the Legislature has enacted two statutes that restrict the e-mailing of unsolicited advertising materials (Bus. & Prof. Code, §§ 17538.4, 17538.45) and another that affords a civil remedy to those who suffer damage or loss from, inter alia, the unauthorized access to a computer system (Pen.Code, § 502, subd. (e)(1)). These statutory provisions and the Legislature's failure to extend these remedies to unsolicited e-mails in general suggests a deliberate decision by the Legislature not to reach the circumstances here. To be sure, common law claims can coexist with statutory enactments. Our Supreme Court has admonished that "statutes do not supplant the common law unless it appears that the Legislature intended to cover the entire subject" (Rojo v. Kliger (1990) 52 Cal.3d 65, 80, 276 Cal.Rptr. 130, 801 P.2d 373; accord, City of Moorpark v. Superior Court (1998) 18 Cal.4th 1143, 1156, 77 Cal. Rptr.2d 445, 959 P.2d 752.) But here Intel *265 seeks not merely to invoke the common law, but to modify it in a way that alters the doctrine's very character in order to extend it where the Legislature has not yet gone. Modification of the tort doctrine in this way, which would affect the free flow of communication on the internet, is better addressed by the legislative branch, or at the very least by a more suitable tort doctrine that can distinguish between reasonable and unreasonable burdens.
As Learned Hand cautionedand this certainly applies when a court construes a common law doctrine that is embedded within a subsequent legislative enactment"the judge must always remember that he should go no further than he is sure the government would have gone, had it been faced with the case before him. If he is in doubt, he must stop, for he cannot tell the conflicting interests in the society for which he speaks would have come to a just result, even though he is sure that he knows what the just result should be. He is not to substitute even his juster will for theirs; otherwise it would not be the common will which prevails, and to that extent the people would not govern." (Hand, How Far is a Judge Free in Rendering a Decision? CBS radio broadcast, May 14, 1933, collected in Aldisert, The Spirit of Liberty, Papers and Addresses of Learned Hand (1952) p. 109.)
NOTES
[1] The full text of section 218, including clause (c), is found at pages 260-261, post.
[2] Nor is America Online, Inc. v. National Health Care Discount (N.D.Iowa 2000) 121 F.Supp.2d 1255, 1278, cited by the majority, to the contrary since there, the defendant conceded that a prima facie case of trespass to chattel had been established. The only issue there was whether the defendant was liable for a third party's actions.
[3] The majority cites to the U.S. Supreme Court's passing reference to a "form of trespass" in the context of unwanted mailings to householders in Rowan v. United States Post Office (1970) 397 U.S. 728, 737, 90 S.Ct. 1484, 1490, 25 L.Ed.2d 736, 742(Rowan). But the high court did not rule that an unwanted mailing constituted a trespass to chattel. "[A]n opinion is not authority for a proposition not therein considered." (Ginns v. Savage (1964) 61 Cal.2d 520. 524. fn. 2, 39 Cal.Rptr. 377, 393 P.2d 689.) In Rowan, the Court rejected a First Amendment challenge to a federal statute that authorized a person to remove his name from mailing lists. The Court stated: "To hold less would tend to license a form of trespass and would make hardly more sense than to say that a radio or television viewer may not twist the dial to cut off an offensive or boring communication and thus bar its entering his home." (397 U.S. at p. 737, 90 S.Ct. at p. 1490, 25 L.Ed.2d at p. 743). Nothing in Rowan suggests the common law, as opposed to a statute, can make unsolicited mailings a trespass to chattel.